**NATURAL RESOURCES DEFENSE COUNCIL; San Diego Baykeeper, Kenneth J. Moser, Plaintiffs–Appellees,**

v.

**SOUTHWEST MARINE, INC., Defendant–Appellant.**

**Nos. 99–56532, 99–56545.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 10, 2000

Filed Dec. 19, 2000

David L. Mulliken and Dorn G. Bishop, Latham & Watkins, San Diego, California, for the defendant-appellant.

Charles S. Crandall, San Luis Obispo, California, Everett L. DeLano III, Law Offices of Everett L. DeLano III, San Marcos, California, John M. Barth, Attorney at Law, Hygiene, Colorado, Scott H. Peters, Peters & Varco, LLP, San Diego, California, Joel R. Reynolds, Natural Resources Defense Council, Los Angeles, California, for the plaintiffs-appellees.

Eric L. Gerner, Best Best & Krieger LLP, Riverside, CA, for amicus curiae.

Before: KOZINSKI, GRABER, and FISHER, Circuit Judges.

GRABER, Circuit Judge:

Defendant Southwest Marine, Inc., appeals from the district court's judgment for Plaintiffs Natural Resources Defense Council (NRDC), San Diego Baykeeper, and Kenneth J. Moser, in their citizen enforcement action under § 505(a) of the Clean Water Act (CWA), 33 U.S.C. § 1365(a). In response to Defendant's challenge, we hold: Plaintiffs have standing to bring this action, Plaintiffs' notice letter was adequate, Defendant's violations were ongoing, the district court's injunctive measures were not an abuse of discretion, and the district court's civil penalty was not an abuse of discretion. Accordingly, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Defendant operates a large shipyard on San Diego Bay. Its principal business is repairing and maintaining marine vessels. Among other things, Defendant's shipyard removes old paint from ships and then repaints them. Defendant commonly removes old paint by blasting the ships' hulls with abrasive grit, composed primarily of particles of copper, that is conveyed on streams of compressed air. Defendant uses about 4 million pounds of copper grit per year for blasting old paint from ships and generates about 4,800 pounds of paint waste per year.

Defendant repaints ships with "antifouling paints," which are paints that are formulated to prevent the growth of aquatic organisms, such as barnacles and algae, on the bottoms of ships. Those paints contain compounds that are toxic to aquatic life.

Defendant's shipyard contains five piers, at which ships are moored while they are being repaired, and two floating drydocks, on which ships rest, out of the water, to allow repair, blasting, and repainting of parts that are normally underwater. When Plaintiffs filed their complaint, Defendant also was operating a marine rail-

way, which is a device that is used to pull ships onto the shore for repair.

Shipyards like Defendant's generate large amounts of wastes and pollutants, including paint chips and abrasive grit. Those wastes and pollutants are discharged into adjacent waters through—among other means—storm water runoff, tidal action, leaks, spills, and overspray. A 1993 report by the California Regional Water Quality Control Board showed elevated concentrations of copper, tributyltin, and zinc—all of which are present in the materials used and the wastes generated at Defendant's shipyard—in the sediments adjacent to the shipyard. The report concluded that Defendant appeared to have discharged copper, tributyltin, and zinc into San Diego Bay, that Defendant's management practices appeared to be inadequate to prevent such discharges, and that the discharges might have long-term negative effects on the water quality of the Bay and on its suitability for human use.

Defendant had applied for and received a National Pollutant Discharge Elimination System (NPDES) permit from the California Regional Water Quality Control Board in 1983. In 1992, Defendant had obtained coverage under the State Water Resources Control Board's 1991 General Industrial Permit for storm water discharges. That permit supplemented Defendant's NPDES permit; the storm water permit applied to discharges of pollutants through storm water, and the NPDES permit applied to other discharges.

Both permits required Defendant to develop and implement plans to limit its discharges of pollutants into the Bay. Rather than relying on specific numerical effluent limitations, the permits required Defendant to create and follow "Best Management Practices" (BMPs).[1] Defendant adopted a written BMP plan on January 15, 1992.

The storm water permit also required Defendant to develop and implement a Storm Water Pollution Prevention Plan (SWPPP) and a Storm Water Pollution Monitoring Plan (SWPMP). The permit specified that the SWPPP was required to include, among other things:

- a description of sources that might add significant quantities of pollutants to storm water discharges;

- a detailed site map;

- a description of materials that had been treated, stored, spilled, disposed of, or leaked into storm water discharges since November 1988;

- a description of the management practices that Defendant employed to minimize contact between storm water and pollutants from vehicles, equipment, and materials;

- a description of existing structural and non-structural measures to reduce pollutants in storm water discharges;

- a description of methods of on-site storage and disposal of significant materials;

- a description of outdoor storage, manufacturing, and processing activities;

- a list of pollutants likely to be present in significant quantities in storm water discharges and an estimate of the annual amounts of those pollutants in storm water discharge;

---

1. BMPs are

schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of "waters of the United States." BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.

40 C.F.R. § 122.2. As described in Defendant's current NPDES permit, BMPs may be "structural" (e.g., tarpaulins and shrouds to enclose work areas, retention ponds, devices such as berms to channel water away from pollutant sources, and treatment facilities) or "non-structural" (e.g., good housekeeping, preventive maintenance, personnel training, inspections, and record-keeping).

- a record of significant leaks or spills of toxic or hazardous pollutants to storm water;
- a summary of existing data describing pollutants in storm water discharge;
- a description of Defendant's storm water management controls, including good housekeeping procedures, preventive maintenance, and measures to control and treat polluted storm water; and
- a list of the specific individuals responsible for developing and implementing the SWPPP.

Defendant submitted its SWPPP in December 1992. The SWPPP required Defendant, among other things, (1) to perform daily inspections to ensure that its shipyard was complying with the requirements of its BMP plan, and (2) to maintain records of those inspections.

On April 30, 1996, Plaintiffs sent Defendant a notice letter, as required by 33 U.S.C. § 1365(b)(1)(A), advising Defendant that it was violating the CWA and that Plaintiffs intended to sue under the CWA's citizen enforcement provisions. A copy of the notice letter and its attachments appears as an Appendix at the end of this opinion.

As discussed below, a party who wishes to sue under the CWA's citizen enforcement provisions may not commence an action until at least 60 days after giving notice of intent to sue. On August 27, 1996, more than 60 days after sending their notice letter, Plaintiffs filed this action. Four days earlier, on August 23, 1996, Defendant had submitted a revised SWPPP and SWPMP. Those revised plans addressed, and attempted to correct, many of the shortcomings described in Plaintiffs' notice letter.

In September 1996, Defendant moved to dismiss this action, arguing that Plaintiffs' notice letter did not comply with the CWA's requirements and, in particular, that the letter was not specific enough to inform Defendant of what standards it allegedly had violated. The district court denied Defendant's motion in a published opinion. *Natural Res. Def. Council, Inc. v. Southwest Marine, Inc.,* 945 F.Supp. 1330 (S.D.Cal.1996).

Defendant then moved for summary judgment, arguing (1) that the district court lacked subject matter jurisdiction because Plaintiffs' allegations of ongoing violations were neither made in good faith nor based on reasonable investigation; (2) that, even if the district court had subject matter jurisdiction, summary judgment was appropriate because Plaintiffs could not prove ongoing violations at trial; and (3) that Plaintiffs' claims were moot.

After continuing the motion to allow more time for discovery, the district court denied summary judgment in an unpublished order. In denying Defendant's motion, the court concluded (1) that it had subject matter jurisdiction because Plaintiffs had alleged continuing violations in good faith; (2) that there were disputed issues of material fact as to whether Defendant (a) had developed an adequate SWPPP and monitoring plan, as required by its storm water permit, and (b) had adequately implemented or was adequately implementing such plans; and (3) that Plaintiffs' action was not moot.

While district court proceedings were pending, Defendant's permits were revised twice. First, Defendant's storm water permit was superseded by a new storm water permit, which took effect May 1, 1997. Second, both the storm water permit and Defendant's NPDES permit were superseded by a new NPDES permit. That permit was issued on October 15, 1997, but was stayed on March 27, 1998, by the Superior Court of the County of San Diego. The superior court lifted that stay later in 1998, and the revised permit became effective at that time.[2]

2. Defendant has operated under three storm water permits during the pendency of this litigation. The provisions of those permits that Defendant was found to have violated, and to which we refer in this opinion, have remained essentially consistent in all three permits.

Defendant also revised a number of its practices related to storm water while this matter was before the district court. Among other things, Defendant revised its BMP plan, as required by its most recent NPDES permit; installed a storm water diversion system covering most (but not all) of its facility; hired a new environmental compliance manager; installed a roof to prevent storm water from reaching hazardous materials; and removed polluted sediments from the area of its marine railways.

This action was tried to the court between November 3 and December 3, 1998. Both sides presented evidence and expert testimony about conditions at Defendant's facility, and the district court made three visits to the facility.

On March 2, 1999, the district court found in Plaintiffs' favor in an unpublished order. After reaffirming its earlier rulings that Plaintiffs had standing and that the notice letter was adequate, the court concluded (1) that Defendant's SWPPP and monitoring plan, as revised in August 1996, were adequate; but (2) that Defendant had failed to implement those plans adequately, thereby violating its permit and the CWA. The court imposed injunctive relief and a civil penalty of $799,000.

The district court then asked Plaintiffs to prepare proposed findings of fact and conclusions of law. Plaintiffs submitted proposed findings on May 7, 1999, and Defendants filed objections thereto. The district court held hearings on July 13 and August 19, 1999, to consider Defendant's objections. Defendant argued, among other things, that the district court's proposed injunction was too broad and too costly. To address those arguments, the district court asked the parties to submit additional evidence concerning the proposed injunction.

On September 7, 1999, the district court issued its findings of fact and conclusions of law. The court found: (1) that Plaintiffs had presented "convincing evidence" that Defendant had not made the required inspections that it claimed to have made;

(2) that, even accepting Defendant's statement that it *had* made the required inspections, Defendant had not maintained adequate *records* of those inspections, with the result that a large number of inspection reports were missing; (3) that the reports that Defendant *had* provided demonstrated a pattern of poor housekeeping at Defendant's facility and showed that violations, when reported, were not always remedied in a timely manner; (4) that Defendant's inadequate implementation of its plans had led to "significant contributions of pollutants to Defendant's leasehold"; (5) that Defendant's leasehold within the Bay was "devoid of life"; (6) that the evidence conclusively demonstrated that substantial quantities of pollutants from Defendant's paint-blasting operations had entered San Diego Bay in Defendant's storm water discharges; (7) that Defendant's failure to implement its storm water plans adequately was contributing to and perpetuating the contamination of its marine leasehold; and (8) that the harm to Defendant's leasehold "could be remedied by Defendant with improved practices." Based on those findings, the court concluded: (1) that it had subject matter jurisdiction over the action; (2) that Plaintiffs had standing; (3) that Defendant had violated, and was continuing to violate, the relevant permits and plans; and (4) that Defendant's failure to implement its plans adequately was the result of "systemic problems" and "overall inadequacies" in implementation, rather than mere "snapshots" of isolated violations.

The district court's findings of fact and conclusions of law also reiterated the injunctive relief and civil penalties that the court had imposed in its earlier order. In response to Defendant's objections, the court entered a limited stay governing several provisions of the injunction, to allow the parties to submit further studies and evidence. On March 6, 2000, the district court held its final hearing regarding the limited stay. After making minor changes to the injunction, the court lifted the stay

in an unpublished order dated March 7, 2000.

In its injunction, the court ordered Defendant (1) to test its storm water discharges for significant pollutants before releasing them into the Bay; (2) to sweep, after every shift, uncontained areas in which operations may have caused deposits of debris and to provide mats and air hoses so that workers could clean their shoes after leaving such areas; (3) to make daily inspections of its facilities (except when the shipyard is not operating) and keep records of those inspections; (4) to test the water column around each vessel that is being blasted or painted to determine if those operations are contributing to pollution in the Bay; (5) to correct conditions that might allow pollutants to enter the Bay, within four hours if feasible; (6) to repair or replace shrouds that are in poor repair; (7) to capture all storm water coming off its piers (the district court allowed Defendant 18 months to comply with this condition); and (8) to erect and maintain concrete berms in areas of the facility from which runoff might enter the Bay. The court rejected Plaintiffs' argument that Defendant should be required to remediate the contamination of the sediments in its marine leasehold.

This timely appeal followed.

## DISCUSSION

Defendant challenges the district court's rulings on (1) standing, (2) the adequacy of Plaintiffs' notice letter, (3) ongoing violations, (4) the terms of the injunction, and (5) the civil penalty. We will address each of those issues in turn.

### I. *Standing*

■ First, Defendant argues that the district court erred in holding that Plaintiffs had standing to bring this action. We review de novo the question whether a party has standing to bring an action. *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1152 (9th Cir.2000).

■ In order to satisfy Article III's standing requirements in a CWA citizen enforcement action, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely ... that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000). An association like NRDC "has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

Defendant argues that Plaintiffs cannot satisfy any of the three requirements for Article III standing. We disagree.

■ First, Plaintiffs showed "injury in fact." The Supreme Court has held that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Id.* at 705 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)). Here, members of the plaintiff organizations, and individual plaintiff Kenneth Moser, testified that they have derived recreational and aesthetic benefit from their use of the Bay (including areas of the Bay next to Defendant's shipyard), but that their use has been curtailed because of their concerns about pollution, contaminated fish, and the like. Those averments are sufficient to satisfy the "injury in fact" component of Article III standing.

■ Second, the injury is "fairly traceable" to the challenged activity. This requirement, more precisely, is that there must be "a causal connection between the injury and the conduct complained of—the

injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Plaintiffs presented evidence that the sediments in Defendant's marine leasehold contained elevated concentrations of pollutants, that Defendant had discharged the same pollutants, and that Defendant's marine leasehold was "devoid of life." That evidence was sufficient to demonstrate that Plaintiffs' injury was "fairly traceable" to Defendant's conduct. As the Fourth Circuit has noted, the threshold requirement of "traceability does not mean that plaintiffs must show to a scientific certainty that defendant's effluent ... caused the precise harm suffered by the plaintiffs" in order to establish standing. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 161 (4th Cir.2000) (en banc) (citations and internal quotation marks omitted). To satisfy this requirement, "[r]ather than pinpointing the origins of particular molecules, a plaintiff must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged in the specific geographic area of concern." *Id.* (citation and internal quotation marks omitted); *see also Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546, 558 (5th Cir. 1996) (to the same effect); *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 72 (3d Cir.1990) (same). Plaintiffs made that showing in this case.

▆▆▆ Third, Plaintiffs demonstrated that a favorable decision would redress their injuries. A plaintiff who seeks injunctive relief satisfies the requirement of redressability by alleging a continuing violation or the imminence of a future violation of an applicable statute or standard. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 108, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Plaintiffs alleged that

Defendant was continuing to violate its permits; what is more, as discussed below, they proved continuing violations at trial. Because they sought an injunction to halt those continuing violations, Plaintiffs satisfied the requirement of redressability.

In sum, the district court did not err in holding that Plaintiffs had standing to bring this action.

## II. *Notice—Subject Matter Jurisdiction*

Next, Defendant argues that Plaintiffs' notice letter was insufficient. Under the CWA,

> No action may be commenced—
>
> (1) under subsection (a)(1) of this section—
>
> (A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order....

33 U.S.C. § 1365(b). The applicable regulation provides that the notice

> shall include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a).

▆▆▆ If a party seeking to bring a citizen enforcement action has not complied with the CWA's notice requirement, then the district court in which that action is brought lacks subject matter jurisdiction and must dismiss the action. *Washington Trout v. McCain Foods, Inc.,* 45 F.3d 1351, 1354 (9th Cir.1995); *see also Hallstrom v. Tillamook County,* 493 U.S. 20, 26, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989) (requiring strict compliance with notice requirement for citizen enforcement action under

the Resource Conservation and Recovery Act). "In practical terms, the notice must be sufficiently specific to inform the alleged violator about what it is doing wrong, so that it will know what corrective actions will avert a lawsuit." *Atlantic States Legal Found., Inc. v. Stroh Die Casting Co.*, 116 F.3d 814, 819 (7th Cir. 1997). We review de novo the district court's conclusion that Plaintiffs' notice was adequate. *See Washington Trout*, 45 F.3d at 1353.

The district court treated Plaintiffs' notice letter as alleging two separate, but related, violations concerning the pollution prevention plans required by its permits and the CWA. The first was Defendant's failure to *prepare* adequate plans; the second was Defendant's failure to *implement* adequate plans.

With regard to those issues, Plaintiffs' notice letter clearly satisfies some of the requirements of notice. The letter was mailed to the appropriate entities. *See* 40 C.F.R. § 135.3(a). It identified the persons giving notice and the persons responsible for the alleged violation. Although the letter did not identify a specific date, or a specific location within Southwest Marine's facility, it nevertheless satisfied those requirements as well. *See id.* Plaintiffs were not alleging that a particular discharge from a particular pipe on a particular day had violated the CWA. Rather, they were alleging that Defendant had failed to prepare and implement plans that were required by its permit. As the district court correctly noted, the failure to develop and implement pollution prevention plans are violations "occurring at the facility in general." *Southwest Marine*, 945 F.Supp. at 1333. Moreover, "the deficiencies in these plans are ongoing, so there is no specific date that can be alleged as the date of the violation." *Id.*

The parties' dispute before us centers on the specificity of the notice letter. *See* 40 C.F.R. 135.3(a) (requiring that a notice letter "include sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to

have been violated, [and] the activity alleged to constitute a violation"). The notice letter generally raises the issues of the preparation and implementation of an adequate SWPPP. Our first question is whether the notice letter raised those issues adequately to satisfy the requirements of the CWA.

As to the alleged failure to *prepare* an adequate plan, the notice letter was clearly adequate, and we do not understand Defendant to argue otherwise. The letter charged, among other things, that Defendant had failed to prepare an SWPPP that complied with the specific requirements of Defendant's storm water permit; identified the source of the requirement that Defendant prepare an adequate SWPPP; and explained the ways in which Defendant's then-existing SWPPP did not comply with the storm water permit.

Defendant argues, however, that the notice letter was not sufficient with regard to Plaintiffs' allegation that it failed to *implement* an adequate plan. Specifically, Defendant asserts that the district court lacked jurisdiction to consider Plaintiffs' allegations of "poor housekeeping." The notice letter alleges that Defendant failed to implement an adequate SWPPP, including a "good housekeeping" provision. "Good housekeeping" was required under Defendant's storm water permits. Defendant acknowledges that the court's reference to "poor housekeeping" does "arguably correspond" to Plaintiffs' reference to storm water controls and good housekeeping in Attachment 2 of the notice letter. See Appendix A at Attachment 2, page 1.

Nevertheless, Defendant argues that Plaintiffs failed to refer to, or identify, the "good housekeeping" provision of its revised SWPPP and, thus, failed to provide any information about how Defendant had violated that specific plan provision. The difficulty with that argument is that the notice letter predates the plan provisions to which Defendant refers. Plaintiffs mailed their notice letter in April 1996. The "good housekeeping" provision to

which Defendant refers, and which Defendant cites in its brief, is contained in Defendant's *revised* SWPPP, which was filed in August 1996. Although we require strict compliance with the CWA's notice requirement, we do not require citizen-plaintiffs to refer to provisions of plans that do not exist.

We hold that the notice letter was sufficient, on the date it was mailed, to allow the district court to exercise jurisdiction over Plaintiffs' "good housekeeping" claims. Defendant was operating under a storm water permit that was designed to prevent discharges of toxic pollutants through storm water. That permit required Defendant to prepare and implement an SWPPP that included a "good housekeeping" provision. The permit explained that "[g]ood housekeeping requires the maintenance of clean, orderly facility areas that discharge storm water. Material handling areas shall be inspected and cleaned to reduce the potential for pollutants to enter the storm water conveyance system." Plaintiffs' notice letter sufficiently alleged that Defendant had failed to prepare *and implement* such a plan.

And Defendant obviously understood at least some of the alleged violations. In response to Plaintiffs' letter, Defendant completely revised its SWPPP and SWPMP within four months, adding sections that specifically made reference to the requirements that Plaintiffs had identified. *See Atlantic States,* 116 F.3d at 820 (concluding that notice was sufficiently specific where the defendant, after receiving notice, took immediate steps to cure the problems identified in the notice letter). And, as noted, Defendant made substantial changes to its facility and operations during the pendency of this litigation, concededly in an attempt to remedy some of the inadequacies of which Plaintiffs had complained.

The second and more theoretical question that Defendant's argument raises is what, if any, effect Defendant's post-notice alterations of its plans and facilities had on the adequacy of the notice letter. If a defendant receives a proper notice letter alleging that it has failed to prepare and implement an adequate plan and, in response, prepares a new plan and begins to implement it before the complaint is filed, is the otherwise proper notice letter defective for failing to identify and discuss the new plan and its implementation? In those circumstances, must a citizen-plaintiff send a new notice letter? We think not. Subject matter jurisdiction is established by providing a notice that is adequate on the date it is given to the defendant. The defendant's later changes to its operations and plans may affect standing, *see Steel Co.,* 523 U.S. at 105–06, 118 S.Ct. 1003; the question of ongoing violations or remedies, *see Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 64, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987); or mootness, *see Laidlaw,* 120 S.Ct. at 708.[3] But such changes do not retroactively divest a district court of jurisdiction under 33 U.S.C. § 1365(b).

Defendant also cites *Washington Trout* and *Hallstrom* in support of its argument that notice was inadequate. Those cases are distinguishable from this one. In *Washington Trout* and *Hallstrom,* the plaintiffs had failed to comply with the facial requirements for notice set out in the applicable statutes and regulations.

In *Washington Trout,* the plaintiffs mailed the defendant a letter alleging improper discharges of pollutants; however, "the letter did not provide the address and phone number of the named plaintiff, nor did it furnish the identity, address, and phone number of [the other plaintiffs]." 45 F.3d at 1352. Further, "the notice failed to specifically identify the dates" of

**3.** Using Defendant's corrective actions as evidence of its understanding of Plaintiffs' letter might seem to suggest a strategy of avoiding remedial measures so as not to create unfavorable evidence. Such corrective actions, however, would benefit a defendant on issues of standing, mootness, and remedy, as illustrated by the cases cited in the text.

the allegedly unlawful discharges. *Id.* This court held that those failures to comply with 40 C.F.R. § 135.3(a) precluded the district court from assuming jurisdiction over any part of the plaintiffs' action. *Id.* at 1354–55.

In *Hallstrom*, the plaintiffs filed a citizen enforcement action under the Resource Conservation and Recovery Act, which contains a notice provision that is substantively identical to the CWA's notice provision. *See* 42 U.S.C. § 6972(b). The Supreme Court held that the district court lacked subject matter jurisdiction over the plaintiffs' action because the plaintiffs had failed to give any notice to the EPA or to the appropriate state agency as § 6972(b) requires. *See Hallstrom*, 493 U.S. at 33, 110 S.Ct. 304.

■■■■ Those cases establish that the CWA's notice requirement is strictly construed and that compliance with the notice requirement is a prerequisite to a citizen enforcement action. But this case presents a different problem. Unlike in *Washington Trout* and *Hallstrom*, the question in this case is not whether the district court had subject matter jurisdiction over *any part* of Plaintiffs' action; Defendant does not contest that the notice was adequate as to the allegation that it had failed to *prepare* an adequate SWPPP. Rather, the question is whether the district court exercised jurisdiction over *particular issues* that were not raised in the notice letter and, thus, were beyond the scope of the court's jurisdiction.

We have resolved that question in Plaintiffs' favor. As discussed above, we hold that Plaintiffs' letter gave Defendant adequate notice of all the claims over which the district court exercised jurisdiction. Accordingly, the district court did not err in concluding that Plaintiffs' notice letter satisfied the requirements of 33 U.S.C. § 1365(b).

### III. *Evidence of Ongoing Violations*

■■■■ Next, Defendant argues that the district court erred in concluding that it had committed "ongoing violations" of

requirements in its storm water permit. We review findings of fact for clear error and conclusions of law de novo. *Russian River Watershed Prot. Comm. v. City of Santa Rosa*, 142 F.3d 1136, 1140 (9th Cir. 1998). We review de novo a district court's interpretation of an NPDES permit when its terms are unambiguous. *Id.* at 1141.

■■■■ The CWA "does not permit citizen suits for wholly past violations"; rather, the statute "confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." *Gwaltney*, 484 U.S. at 64, 108 S.Ct. 376. Here, the district court properly concluded that Plaintiffs had made such good-faith allegations and thereby had satisfied *Gwaltney*'s threshold requirement for jurisdiction.

■■■■ To prevail at trial, a citizen-plaintiff must prove that ongoing violations actually have occurred. "[A] citizen plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.'" *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988) (quoting *Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.*, 844 F.2d 170, 171–72 (4th Cir.1988)). This court also has adopted the Fourth Circuit's conclusion that " '[i]ntermittent or sporadic violations do not cease to be ongoing until the date when there is *no real likelihood of repetition.*' [*Chesapeake Bay Found.*, 844 F.2d] at 172 (emphasis added)." *Id.*

Defendant groups three arguments under this heading. First, Defendant argues that the district court erred in holding that it had violated any condition of its storm water permit. We disagree. As noted, the district court found that Defendant had failed to make—or had failed to keep records of—numerous daily inspections of

its facility. Those daily inspections—and records of the inspections—were required by Defendant's 1992 and 1996 SWPPPs. The SWPPPs, in turn, were required by Defendant's storm water permit, which contemplated that Defendant would inspect its facility and keep records of its inspections. The district court also found that the inspection reports that Defendant did produce revealed "a pattern of poor housekeeping." Defendant's own inspection reports showed that the "good housekeeping" standard was not met uniformly and that violations were not always remedied quickly.

Moreover, the district court found that Defendant's failure adequately to implement its SWPPP "led to significant contributions of pollutants" to the Bay from Defendant's discharges. The court further found that those discharges contributed to the contamination of Defendant's marine leasehold and that the leasehold is "devoid of life." Those findings are supported by evidence and, accordingly, are not clearly erroneous. Each of Defendant's successive storm water permits has specifically prohibited discharges that cause adverse effects on the environment. For example, Defendant's current storm water permit prohibits discharges that degrade marine communities, cause adverse effects on the environment, or result in harmful concentrations of pollutants in marine sediments. Because the district court found that Defendant's failure to implement its storm water plans led to discharges that violated those standards, the court's conclusion that Defendant violated its storm water permit was not error.

 Second, Defendant argues, "[e]ven assuming *arguendo* that Southwest Marine did not, at some point in time, implement its stormwater plans adequately, it was legal error for the district court to find an *ongoing* violation of that permit requirement." (Emphasis in original.) As a threshold matter, we reject Defendant's argument that we review this question for legal error. The district court's conclusion that Defendant's violations were ongoing

was a finding of fact, which we must affirm unless clearly erroneous. *See Union Oil*, 853 F.2d at 671 (stating that a plaintiff could prove a continuing violation "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations").

Here, the district court found that Defendant had failed to implement its plans adequately even after Plaintiffs filed their complaint. As the district court noted, there is evidence of incidents of poor housekeeping during the pendency of this action. Defendant argues that the district court's finding of an ongoing violation "improperly combines several discrete and unrelated workplace incidents." But the district court found that the ongoing violations "present[ed] a picture of overall inadequacies," not mere "snapshots." Notwithstanding Defendant's argument, we may not disturb that finding if it is supported by evidence. And it is; the evidence on which the district court relied was sufficient to permit a reasonable trier of fact to find "a continuing likelihood of a recurrence in intermittent or sporadic violations." *Union Oil*, 853 F.2d at 671. Accordingly, the district court's finding of a continuing violation was not clearly erroneous.

Third, Defendant argues that, even if there is sufficient evidence in the record to establish an ongoing violation of the permit, we should nevertheless remand for the district court to explain further the factual and legal basis for its decision. Because we conclude that the district court has provided sufficient factual and legal support for its decision, we do not agree that remand is necessary or appropriate.

IV. *The Injunction*

 Next, Defendant argues that the injunction was improper. District courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th

Cir.1994). We review a district court's decision to issue an injunction under the CWA, and its determination of the scope of that injunction, for abuse of discretion. *See Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg., Inc.,* 906 F.2d 934, 937 (3d Cir.1990) (so holding); *see also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 320, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (describing decision to award or deny injunction as an exercise of a district court's equitable discretion).

Defendant contends that the district court abused its discretion by imposing requirements that are not contained in Defendant's permits or plans. By so doing, Defendant argues, the district court essentially overrode the existing permits. According to Defendant, that was improper for two reasons: (1) it was an abuse of discretion, and (2) it violated principles of separation of powers by usurping the authority of the executive-branch agencies that issued the permits. Because those arguments both turn on the underlying question whether the district court overrode Defendant's existing permits, we address the arguments together.

■■■■ Defendant is correct that a district court's equitable powers under the CWA are limited to enforcing standards, limitations, and orders that have been violated. 33 U.S.C. § 1365(a). That enforcement authority does not allow equitable measures that are wholly unrelated to a violation of an existing standard, limitation, or order. Nor may a district court exercise its general equitable authority to override the terms of a properly issued permit. *See City of Milwaukee v. States of Illinois & Michigan,* 451 U.S. 304, 320, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("Federal courts lack authority to impose more stringent effluent limitations under federal common law than those imposed by the agency charged by Congress with administering this comprehensive scheme.").

But here the district court permissibly found violations of extant permits. The key question is what a district court may do, pursuant to its equitable powers, in aid of enforcing standards, limitations, and orders that have been violated.

According to Defendant, a court may do little more than tell the violator to comply with the applicable requirements. Thus, Defendant says, the district court in this case should have "simply order[ed] Southwest Marine to comply with specifically-identified pollution plan provisions."

■■■■ We do not agree that a district court's equitable authority is so cramped. The authority to "enforce" an existing requirement is more than the authority to declare that the requirement exists and repeat that it must be followed. So long as the district court's equitable measures are reasonably calculated to "remedy an established wrong," they are not an abuse of discretion. *Alaska Ctr.,* 20 F.3d at 986.

■■■■ We conclude that the injunctive measures satisfy that standard. Those measures all are consistent with, and complementary to, existing permit requirements. The requirement that Defendant's employees sweep open areas where debris may have accumulated (or certify that there was no debris to sweep) and wipe their feet on mats after leaving such areas is a good housekeeping measure designed to remove pollutants from areas where storm water accumulates, as contemplated in Defendant's permits; the requirement that Defendant fix and maintain its shrouds is consistent with the permit requirement for structural BMPs, such as shrouds, that provide overhead coverage; the requirement that Defendant install concrete berms is consistent with the requirement for structural BMPs, such as berms, that channel or route storm water away from sources of pollutants; the requirement that Defendant conduct water-column testing around each vessel that is being blasted or painted is consistent with the permit requirements for storm-water monitoring; the requirement that Defendant make daily inspections and keep records of those inspections is consistent with numerous permit requirements requiring

monitoring and record-keeping (and, further, is almost identical to a provision in Defendant's original BMP plan); the requirement that Defendant correct potentially dangerous conditions within four hours, if feasible, is consistent with permit requirements for prompt response in cases of leaks and spills; and the requirements that Defendant capture storm water coming off piers and test storm water discharges before releasing them into the Bay are consistent with the requirement that Defendant not discharge storm water that adversely affects the environment or degrades marine communities on Defendant's leasehold, which the district court found had been rendered devoid of life by (among other things) Defendant's discharges.

The injunctive measures are consistent with the terms of Defendant's storm water permits and seek to enforce the requirements of those permits and the relevant plans. They are not identical to the requirements of the plans and permits, but complement those requirements. In imposing those injunctive measures, the district court did not override agency determinations or supersede existing permit requirements. Rather, it properly exercised its equitable authority to enforce existing requirements with which Defendant had failed to comply.

Our conclusion that those provisions of the injunction were consistent with Defendant's storm water permit also disposes of Defendant's separation-of-powers argument. Because the district court merely enforced the permits, it did not "usurp" the authority of the executive branch.

Defendant also argues that the district court failed to balance the equities or make the necessary findings before issuing its injunction. We are unpersuaded. The district court considered Defendant's testimony concerning the cost and difficulty of the various injunctive measures. The district court also heard testimony throughout the trial about the extreme degree of environmental degradation in the Bay in general, and on Defendant's leasehold in

particular. The court temporarily stayed the injunction to allow further argument and evidence, and eventually modified the original injunction with respect to testing, containment of runoff, and cleanup. Finally, in its order lifting the temporary stay, the court noted that it was mindful of the cost that it was imposing on Defendant, but concluded that the cost was outweighed by the need for swift corrective action and the fragility of the local marine environment. The district court's findings and balancing of the equities were adequate to justify its injunction.

In sum, we conclude that the district court's injunction was not an abuse of discretion. We also conclude that the injunction did not violate the separation-of-powers doctrine. Therefore, we affirm the injunction in its entirety.

## V. *Civil Penalties*

 Finally, Defendant argues that the district court abused its discretion in imposing a civil penalty of $799,000, because the penalty is excessive, unreasonable, and unsupported by evidence. We review for abuse of discretion the amount of a civil penalty under the CWA. *Leslie Salt Co. v. United States*, 55 F.3d 1388, 1397 (9th Cir.1995).

 The district court imposed the penalty pursuant to 33 U.S.C. § 1319(d), which provides, as relevant: "Any person who violates ... any permit condition or limitation ... shall be subject to a civil penalty not to exceed $25,000 per day for each violation." If a district court finds a violation, then civil penalties under 33 U.S.C. § 1319(d) are mandatory. *Leslie Salt,* 55 F.3d at 1397. A district court has discretion to set the amount of a penalty (up to the statutory maximum) and is instructed to consider the seriousness of the violation, any economic benefit that resulted from the violation, any history of violations by the party to be penalized, that party's good-faith efforts to comply with the applicable requirements, the economic effect of the penalty on the violator, and

"such other matters as justice may require." 33 U.S.C. § 1319(d).

 The district court found that Defendant had been in violation of the CWA for 799 days when the trial began and, after considering the statutory factors, imposed a penalty of $1,000 for each of the 799 days of violation. However, the court also ordered that the penalty will be reduced by the amount of the cost of any actions that Defendant takes to improve its storm water diversion system and any changes that Defendant makes to its facilities to comply with the court's injunction.

Thus, the amount of the penalty actually is *$799,000 minus the cost of such physical alterations.* In challenging the injunction, Defendant presented evidence that *one* such alteration—the installation of a storm-water diversion system—would cost more than $1 million *by itself.* Accordingly, anticipated alterations, when offset against the $799,000 civil penalty, will reduce the penalty to zero. In the circumstances, we cannot agree that the penalty is excessive, and we hold that the district court did not abuse its discretion.

## CONCLUSION

For the reasons stated, we AFFIRM the district court's judgment in favor of Plaintiffs, the injunction, and the civil penalty.

# APPENDIX

**BAYKEEPER**

April 30, 1996

<u>Certified Mail -- Return Receipt Requested</u>

Art Engle
President
Southwest Marine, Inc.
P.O. Box 13308
San Diego, California
92170-3308

Lawrence Killeen
Executive Director
San Diego Unified Port District
P.O. Box 488
San Diego, California
92112

Re: <u>Notice of Intent to Sue for Violations of the Clean Water
 Act</u>

Dear Messrs. Engle and Killeen:

 We write to notify you that the San Diego BayKeeper and the
Natural Resources Defense Council ("NRDC") believe that Southwest
Marine, Inc. and the San Diego Unified Port District ("Port
District") are violating the Federal Water Pollution Control Act,
33 U.S.C. §§ 1251-1376 ("Clean Water Act" or "Act"), as described
below.

 The information currently available to us indicates that
Southwest Marine and the Port District have violated and continue
to violate requirements concerning discharges from the Southwest
Marine facility at the foot of Sampson Street in the City of San
Diego. These requirements, including requirements related to
discharges associated with or ancillary to industrial
manufacturing and treatment, are embodied in the Act, its
implementing regulations, and National Pollutant Discharge
Elimination System ("NPDES") Permit No. CA0107697. This permit
was issued pursuant to the Act by the California Regional Water
Quality Control Board, San Diego Region ("Regional Board") on or
around April 18, 1983. The requirements with which we believe
Southwest Marine and the Port District have failed to comply are
set forth in Attachment 1 to this letter. <u>See also</u> 33 U.S.C.
§§ 1311(a), 1314(e), & 1365, 40 C.F.R. Subpart K.

 Additionally, the information currently available to us
indicates that Southwest Marine and the Port District have
violated and continue to violate NPDES General Permit No.
CAS000001 governing stormwater discharges associated with

PLAINTIFF'S
EXHIBIT
12
96-1992-B-AJB

1450 Harbor Island Dr Ste 207 • San Diego CA 92101 • Mailing Address PO Box 82045 • San Diego CA 92138-2045
619-299-4484 / FAX 619-299 4485 / Pollution Hotline 1-800-HELPBAY
Member of the National Alliance of River Sound & BayKeepers

Messrs. Engle and Killeen
April 30, 1996
Page 2

industrial activities in California ("General Industrial
Permit"). The General Industrial Permit was issued pursuant to
the Act by the California State Water Resources Control Board
("State Board") on or around November 19, 1991, and amended by
the State Board on or around September 17, 1992. Coverage under
and compliance with the General Industrial Permit are required
before Southwest Marine can lawfully discharge stormwater
associated with industrial activity. The General Industrial
Permit requirements with which we believe Southwest Marine and
the Port District have failed to comply are set forth in
Attachment 2 to this letter. _See also_ 33 U.S.C. §§ 1311(a),
1342(p), & 1365, 40 C.F.R. § 122.26.

The San Diego BayKeeper and NRDC hereby notify you of their
intent to sue Southwest Marine and the Port District for their
failure to comply with requirements embodied in the Clean Water
Act, the Act's implementing regulations, NPDES Permit No.
CA0107697, and the General Industrial Permit. With this letter,
the undersigned give notice of the alleged violations to the
following parties: Art Engle as owner and/or managing agent of
Southwest Marine; Lloyd A. Schwartz as registered agent in
California of Southwest Marine; Lawrence Killeen as the head of
the Port District; the Administrator of the United States
Environmental Protection Agency ("EPA"); the Regional
Administrator of EPA; the Executive Officer of the State Board;
and the Acting Executive Officer of the Regional Board.

We believe that this notice of intent to sue sufficiently
states the grounds for complaint. This notice covers all
violations through the present. A suit, when filed, will also
address any violations that occur after service of this notice
letter. The San Diego BayKeeper and NRDC intend to sue on behalf
of their organizations and their respective members.

The San Diego BayKeeper and NRDC pursue negotiation whenever
possible. This negotiation policy applies to all types of
environmental disputes, including enforcement of stormwater
pollution prevention requirements. In keeping with this policy,
we invite you to discuss your Clean Water Act compliance with us.

If you have any question about the issues raised in this
letter or if you believe any of our allegations are incorrect,
please contact us by telephone, telecopy or mail. We can be
reached at the offices of the San Diego BayKeeper, listed on the
first page of this letter. NRDC's office location is as follows:
6310 San Vicente Blvd., Suite 250, Los Angeles, California 90048,
(213) 934-6900 (voice), (213) 934-1210 (facsimile). If you wish
to contact us before we file a complaint, we request that you do

Messrs. Engle and Killeen
April 30, 1996
Page 3

so as quickly as possible. We intend to file suit 60 days after
the date of this letter. See 33 U.S.C. § 1365(b)(1)(a).

Sincerely,

Everett L. DeLano, III
Senior Project Attorney
San Diego BayKeeper/
Natural Resources Defense Council

Ken Moser
Executive Director
San Diego BayKeeper

Enclosures

cc: Carol Browner
 Administrator
 U.S. Environmental Protection Agency
 401 M Street, S.W.
 Washington, D.C. 20460

 Felicia Marcus
 Regional Administrator, Region 9
 U.S. Environmental Protection Agency
 75 Hawthorne Street
 San Francisco, CA 94105

 Walt Pettit
 Executive Director
 State Water Resources Control Board
 901 P Street
 Sacramento, CA 95814

 John Robertus
 Acting Executive Officer
 California Regional Water Quality Control Board
 San Diego Region
 9771 Clairemont Mesa Blvd., Suite B
 San Diego, CA 92124-1331

 Lloyd A. Schwartz
 Registered Agent
 Southwest Marine
 P.O. Box 13308
 San Diego, California
 92170-3308

1006

## Attachment 1

The information currently available to the San Diego *BayKeeper* and *NRDC indicates that Southwest Marine* and the Port District have violated the Act, its implementing regulations, and NPDES Permit No. CA0107697. These violations include, but are not limited to, the following:

1) NPDES Permit No. CA0107697 Parts B.3 (p.7) & D.7 (p.10), and 40 C.F.R. § 125.104(b), requiring the development and implementation of best management practices programs, including, but not limited to:

 • establishing specific objectives for control of toxic and hazardous pollutants by predicting direction, rate of flow and total quantity of pollutants; and,

 • addressing the following points for ancillary activities: material inventory; material compatibility; reporting and notification procedures; visual inspections; preventive maintenance; and, security.

2) NPDES Permit No. CA0107697 Part C.5 (p.8), prohibiting concentrations of toxic substances in waters that produce detrimental physiological responses in human, plant, animal, or aquatic life.

3) NPDES Permit No. CA0107697 Part E.10 (p.14) and 40 C.F.R. § 125.104(c)(1), requiring the submittal of a complete permit application.

## Attachment 2

The information currently available to the San Diego
BayKeeper and NRDC indicates that Southwest Marine and the Port
District have violated the General Industrial Permit. These
violations include, but are not limited to, the following:

1) Parts B.1 & B.2 (p.3)[1], prohibiting stormwater
discharges that adversely impact human health or the
environment, and prohibiting stormwater discharges that
cause or contribute to a violation of any applicable water
quality standards, respectively.

2) Part C.2 (p.3) and Section A (pp.5-7), requiring the
development and implementation of a Stormwater Pollution
Prevention Plan, including, but not limited to:

• listing pollutants likely to be present in stormwater
in significant quantities and estimating the annual
quantities of these pollutants, Section A.4.d; and,

• describing the stormwater management controls
appropriate for the facility (for example, stormwater
pollution prevention personnel, preventive maintenance,
good housekeeping, spill prevention and response,
stormwater management practices, erosion and sediment
controls, employee training, and inspections), Section
A.5.

3) Part C.3 (p.3) and Section B (pp.9-16), requiring the
development and implementation of a monitoring and reporting
plan, including, but not limited to:

• conducting an annual site inspection, Section B.5.a;

• conducting visual observations of all stormwater
discharge locations during the first hour of one storm
event per month that produces significant stormwater
discharge, Section B.5.c;

• collecting and analyzing samples of stormwater
discharge from at least two storm events, Section
B.5.d;

• analyzing samples of stormwater discharge for toxic
chemicals and other pollutants that are likely to be
present in stormwater discharge in significant
quantities, Section B.5.d.ii;

---

[1] Part, Section, and Page references are to the General
Industrial Permit.

1008 

- collecting samples from all locations where stormwater is discharged or, in the alternative, adequately establishing and documenting that stormwater discharges from different locations are substantially identical, Section B.11;

- notifying the Regional Board, and, if applicable, appropriate local agency, of instances of non-compliance with General Industrial Permit requirements, Section B.17.