Enoch ADAMS, Jr., Leroy Adams, Andrew Koenig, Jerry Norton, David Swan, and Joseph Swan, Plaintiffs,

v.

TECK COMINCO ALASKA, INC., Defendant.

Nana Regional Corporation and Northwest Arctic Borough, Interveners–Defendants.

No. A04–49 CV (JWS).

United States District Court, D. Alaska.

Oct. 28, 2005.

## ORDER FROM CHAMBERS

**[Re: Motions at dockets 41 and 52]**

SEDWICK, District Judge.

### I. MOTIONS PRESENTED

At docket 41 defendant Teck Cominco Alaska, Inc. ("Teck") moves for summary judgment seeking dismissal of all claims brought by the six individual plaintiffs, Enoch Adams, Leroy Adams, Andrew Koenig, Jerry Norton, and Joseph Swan (collectively "Adams") which relate to the discharge of the heavy metal cadmium on the basis that Adams lacks standing. If the court declines to dismiss all the claims for lack of standing, Teck wants the court to determine that there was no violation of the cadmium limit on June 13, 2000. At docket 52 Adams cross-moves for summary judgment establishing Teck's liability on all of the cadmium claims. Adams also seeks a determination that there was a cadmium violation on June 13, 2000. The motions have been fully briefed. No party has asked for oral argument, and it would not assist the court.

### II. BACKGROUND

In addition to Teck, there are two other defendants, both interveners. NANA Regional Corporation (NANA), an Alaska Native Regional Corporation created pursuant the Alaska Native Claims Settlement Act and Alaska corporation statutes, was

permitted to intervene as a defendant for all purposes.[1] The Northwest Arctic Borough (Borough), an Alaska municipal corporation, was permitted to intervene in the remedy phase of the litigation only.[2]

Except as otherwise noted, the facts appearing in this section are those alleged in Adams' complaint[3] which have not been denied by the defendants in their answers.[4] Plaintiffs reside in the village of Kivalina located near the mouth of the Wulik River in northwestern Alaska. The Wulik River is a primary source of drinking water for residents of Kivalina. Plaintiffs harvest fish from the Wulik River and its tributaries, and at least some of them harvest fish and marine mammals from the waters of the Chuckchi Sea, not far from where the river debouches into the sea. The fauna harvested are a food source for plaintiffs.

Teck operates the Red Dog Mine, the world's largest zinc mine. It is located on land owned by NANA, situated within the Borough about 55 from the Chuckchi Sea. Ore removed from the open pit mine is milled to obtain zinc and lead concentrates. Throughout the year, the concentrates are trucked over the DeLong Mountain Road to enormous storage buildings situated about a mile from tidewater. During the months when the Chuckchi Sea is free of ice, the concentrates are loaded aboard ships for transport to smelters outside Alaska. The tidewater storage facilities and other infrastructure at the port site are also on NANA land. Teck operates the mine and the port site under an agreement with NANA.

Tailings and process wastewater resulting from the milling operation are impounded in a storage area, or tailings pond, from whence treated wastewater is discharged into the Middle Fork of Red Dog Creek through Outfall 001. Although mining takes place year round, wastewater is discharged only during the warmer periods, generally from May until early October.

Federal law prohibits discharge of pollutants from point sources except in compliance with the provisions of the Clean Water Act.[5] The discharge of pollutants may be authorized in a National Pollution Discharge Elimination System ("NPDES") permit.[6] While federal law contemplates

1. Doc. 10.

2. Doc. 18.

3. Docs. 1 and 26. The Revised Complaint at doc. 26 differs from the original only in that plaintiffs have removed the references indicating that they are "KRPC members" as required by the court's order at docket 25.

4. Teck's answer is at doc. 6, NANA's at doc. 11, and the Borough's at docket 19. In a few instances-e.g., the Wulik River is a "primary" source of drinking water not just a source-Teck has expressly admitted more detail in its answer than NANA and the Borough, who have responded with pro forma denials for lack of sufficient information. Given that Teck is the targeted defendant and that Teck, NANA, and the Borough have common interests, in those instances where Teck's personnel are positioned to be knowledgeable about the allegation, the court has accepted as fact the more detailed allegation admitted by Teck. Similarly, where allegations of fact are specific to one defendant-such as the relationship between Teck and its associated businesses-an admission by the particular defendant has been accepted even if another defendant has responded with a denial for lack of sufficient information.

5. 33 U.S.C. § 1311(a). Section 1 of Pub.L. 95–217 indicates that a set of federal water pollution control statutes-statutes that happen to include those of great relevance to this litigation may be cited as the "Clean Water Act of 1977." For simplicity and because there have been subsequent amendments, the court uses the term "Clean Water Act" to refer to this statutory scheme.

6. 33 U.S.C. § 1342(a).

that upon submission of an approved program, individual states may issue NPDES permits,[7] in Alaska such permits are issued by the federal Environmental Protection Agency ("EPA").

EPA issued NPDES permit number AK–03865–2 for the mine in 1985, reissued the permit in 1998, modified the permit in July 2003, and administratively extended it when the permit expired on August 28, 2003 ("Mine Permit"). The Mine Permit authorizes Teck to discharge 2.418 billion gallons of effluent from the tailings pond via Outfall 001 each year. Eleven discharge parameters are found in the Mine Permit which uses two limitation types-daily maximum discharge limits and monthly average discharge limits. The Mine Permit sets limits for the discharge of cadmium as a daily maximum concentration of 3.4 parts per billion ("ppb") and a monthly average concentration of 2.0 ppb. The Mine Permit also lays out monitoring and reporting requirements as well as management measures. The Mine Permit's cadmium limits are meant to assure compliance with state water quality standards.[8] Teck uses a precipitation process to reduce cadmium concentrations in the discharge at the mine.[9]

In the complaint, Adams alleges that Teck violated the Mine Permit's daily discharge limit for cadmium on June 13, 2000, and July 30, 2001, and that it violated the monthly average limit a total of 38 times in October of 2000 and in July of 2001. Teck concedes that there were violations of the discharge limits on 39 of the occasions alleged by Adams, but Teck denies that there was a violation on June 13, 2000.

EPA issued the current NPDES permit number AK–004064–9 for the port site with an effective date of January 29, 1999 (Port Permit). The Port Permit authorizes Teck to discharge treated wastewater from a sewage treatment plant into the Chuckchi Sea via Outfall 001, and to discharge drainage from the concentrate storage buildings into the Chuckchi Sea or onto the tundra from Outfall 005. The Port Permit contains cadmium limits which are different from those in the Mine Permit. The limits in the Port Permit are derived from technology standards, not set on the basis of the state water quality standards which apply in the vicinity of the mine. Teck uses an ion-exchange process to reduce cadmium concentrations in the discharge at the port site.[10]

The dispute about cadmium limits involves violations of the Mine Permit. Adams' complaint does not include any claims based on violation of the Port Permit cadmium limits. Additional facts are set out below.

### III.  SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if there is no genuine dispute as to material facts and if the moving party is entitled to judgment as a matter of law. The moving party has the burden of showing that there is no genuine dispute as to material fact.[11] The moving party need not present evidence; it need only point out the lack of any genuine dispute as to material fact.[12] Once the moving party has met this bur-

---

7.  33 U.S.C. § 1342(b), (c).

8.  Declaration of Mark Thompson attached as an unnumbered exhibit to docket 59 at ¶ 7.

9.  *Id.* at ¶ 6.

10.  *Id.*

11.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

12.  *Celotex*, 477 U.S. at 323–325, 106 S.Ct. 2548.

den, the non-moving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[13] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[14] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[15]

## IV.  DISCUSSION

In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation*,[16] the Supreme Court held that the Clean Water Act does not confer jurisdiction on the federal courts to adjudicate citizen suits based on alleged violations of the Clean Water Act when the alleged violations are all past violations unless the violations are premised on a good faith belief that the violations are on-going. Once jurisdiction is established, the Ninth Circuit has explained that a citizen suit plaintiff may establish at trial that the violations are ongoing, in either of two ways:

> [A] citizen plaintiff may prove ongoing violations 'either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations.' *Chesapeake Bay Foundation v. Gwaltney*, 844 F.2d 170,

171–72 (4th Cir.1988) *on remand from* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).[17]

The Ninth Circuit also has explained that intermittent or sporadic violations are to be considered ongoing unless there is *"no real likelihood of repetition."* [18]

## A.  Teck's Motion Respecting All Cadmium Claims

Teck's motion for dismissal of all the cadmium claims is premised on a single proposition: "Plaintiffs are without standing to pursue their cadmium claims unless they can establish that the cadmium violations were ongoing as of March 8, 2004, the date their Complaint was filed." [19] This argument is, of course, governed by the Supreme Court decision in the *Gwaltney* case. To succeed, Teck must show that Adams' complaint lacks a good faith allegation of on-going violations. The complaint clearly alleges on-going violations, so the only possible defect in subject matter jurisdiction would be that the allegations were not made in good-faith. Teck has presented no direct evidence of a lack of good faith. Instead, it has presented evidence suggesting there is no likelihood of any future violation of the cadmium limits at the mine site. Were Teck able to establish that Adams knew of all or most of that evidence at the time the complaint was filed, it would be necessary to consider whether the evidence would support an inference of bad faith. Teck makes no showing that when the complaint was filed, Adams was aware of most of the evidence.

**13.** *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–9, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

**14.** *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

**15.** *Id.*, 477 U.S. at 248–9, 106 S.Ct. 2505.

**16.** 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

**17.** *Sierra Club v. Union Oil Co. Of Calif.*, 853 F.2d 667, 671 (9th Cir.1988).

**18.** *Id.*, quoting from the 4th Circuit's *Chesapeake* decision (emphasis by Ninth Circuit).

**19.** Doc. 41 at p. 5.

Significantly, Teck does not show that Adams was aware of what appears to the court to be the most important piece of evidence-the implementation and observed success of the sodium sulfide precipitation process for removing cadmium from the effluent at the mine.[20]

The evidence Teck has marshaled would have to be considered if Teck had moved for summary judgment on the grounds that a reasonable trier of fact would necessarily conclude there is "no real likelihood of repetition," but that is not the basis for Teck's motion. As noted above, the request to dismiss all of the cadmium claims is premised exclusively on an alleged lack of standing, and under the rules which govern the litigation at bar, a good faith allegation is sufficient to confer standing.

## B. The June 13, 2000 Cadmium Violation

The facts surrounding the reported violation on June 13, 2000, are rather complicated. For the discharge season in 2000, Teck decided to change its outside analytical laboratory from Columbia Analytical Services ("Columbia") to CT & E.[21] Recognizing the difficulty in analyzing samples for the presence of minute concentrations of heavy metals in samples that would be high in calcium, Teck determined to check on CT & E's initial testing by sending split samples to both Columbia and CT & E.[22] Thus, with respect to June 13, 2003, Teck drew a single sample and split it in two, one part was sent to Columbia and one part to CT & E.[23] Teck also drew a separate sample from the same source for testing in its own lab.[24] CT & E analyzed the material it received and reported a cadmium concentration of 3.84 ppb and its own reanalysis showed 3.79 ppb. However, the Columbia analysis showed 0.53 ppb, and Teck's in-house analysis of the similar sample showed 0.8 ppb.[25]

Teck believed that CT & E's results were incorrect, because they were not consistent with the results from the Columbia and Teck labs, and yielded a concentration higher than historically observed cadmium concentrations.[26] Nevertheless, Teck reported the results of all the testing to EPA in a Discharge Monitoring Report ("DMR"), flagged the CT & E results as in excess of permit limits, and officially reported a cadmium violation.[27] Teck later conferred with EPA and submitted a revised DMR which repeated the sampling results but indicated that there was no violation.[28]

When the revised DMR was prepared and filed with EPA is difficult to ascertain. Teck's lawyer, Lawrence Hartig, says it was filed on or about March 1, 2003, citing the Declaration of Mark Thompson dated

---

20. The process and the results of its implementation are described in the Declaration of Jason Weakley, attached as an unnumbered exhibit to docket 59. Teck does make a showing discussed further below that Adams' lawyer was advised of information respecting the violation on June 13, 2000, which Teck contends shows that there was no violation on that particular date. Even if Teck's contention had merit, the elimination of one of forty reported violations would not support an inference of bad faith.

21. Declaration of Mark Thompson dated April 2, 2005, unlabeled exhibit attached to doc. 41, at ¶ 9.

22. *Id.* at ¶ 11.

23. *Id.* at ¶¶ 10 and 11.

24. *Id.* at ¶ 10.

25. *Id.* at ¶ 12.

26. *Id.* at ¶ 13.

27. *Id.* at ¶ 13.

28. *Id.* at ¶ 14.

April 2, 2005, as the evidentiary support for that statement.[29] However, the cited declaration is silent with respect to when the revised report was prepared and filed. For his part, Adams' lawyer Luke Cole asserts that the revised report was filed "some years after the fact" and cites to paragraph 14 of his own declaration to support that assertion.[30] The problem with his assertion is that his declaration contains no paragraph 14.[31] The only evidence which the parties have supplied is found in the Declaration of Lawrence Hartig,[32] which authenticates an attached copy of the revised report which bears a date of March 1, 2003.[33] The Hartig declaration also establishes that a copy of the revised DMR was forwarded to Adams' counsel on March 7, 2003.[34] Arguing that the revised DMR should control, Teck seeks summary judgment. Adams seeks summary judgment on the grounds that the original report clearly established a violation and a sampling error is not a viable defense.

In *Sierra Club v. Union Oil Co. of Calif.*,[35] the Ninth Circuit disapproved the use of sampling errors as a defense to a claim based on a reported violation of an NPDES permit. Adams contends that *Sierra Club* controls. Teck argues that *Sierra Club* should be distinguished. The *Sierra Club* court explained why sampling errors cannot be used to defend against claims that an NPDES permit has been violated:

> Were we to accept Union Oil's argument regarding the use of sampling errors to excuse reported permit exceedances, we would be sanctioning countless additional hours of NPDES litigation and creating new, complicated factual questions for district courts to resolve. As indicated by the legislative history, Congress hoped to limit such situations. In addition, if each self monitoring report is to be considered only prima facie rather than conclusive evidence of an exceedance of a permit limitation, citizen groups like the Sierra Club would be taking a considerable risk whenever they initiated a citizen enforcement action .... While a permitee's publicly filed reports might clearly indicate that illegal pollution was taking place, the permittee might have additional information unavailable to citizen groups indicating that sampling error rendered the reports meaningless. Finally and most importantly, allowing permittees to excuse their reported exceedances by showing sampling error would create the perverse result of rewarding permittees for sloppy laboratory practices. Such an approach would surely undermine the efficacy of the self-monitoring program. We conclude that when a permittee's reports indicate that the permittee has exceeded permit limitations, the permittee may not impeach its own reports by showing sampling error.[36]

**29.** Doc. 59, at p. 27.

**30.** Doc. 52, at p. 13.

**31.** The affidavit ends with ¶ 11. *See* Declaration of Luke Cole attached to docket 52.

**32.** Doc. 59, unnumbered exhibit.

**33.** *Id.* at ¶ 4.

**34.** *Id.*

**35.** *Sierra Club v. Union Oil Co. Of Calif.*, 813 F.2d 1480, 1491–93 (9th Cir.1987), *vacated for reconsideration*, 485 U.S. 931, 108 S.Ct. 1102,

99 L.Ed.2d 264 (1988), *reinstated and amended*, 853 F.2d 667 (9th Cir.1988).

**36.** 813 F.2d at 1492. It may be noted that the concern for the risk borne by a plaintiff who sues in reliance on a report has been ameliorated, but not eliminated by the Supreme Court's decision in *Gwaltney*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306, which holds that a Clean Water Act plaintiff has standing if his claims are pled in "good faith." It would certainly be appropriate to rely on a filed report. However, the risk that a plaintiff would incur needless costs by initiating litigation which would not succeed if a defendant

Teck's arguments for distinguishing *Sierra Club* are not persuasive. In essence, they boil down to the proposition that Teck does not seek to use sampling error as a defense but rather to use the "correct" DMR to show there was no violation. Such an approach still falls within the reach of the *Sierra Club* rationale. First, litigating over which of two reports is the "correct" one encourages additional hours of litigation. In a related way, providing Adams' counsel with a second "correct" report on March 7, 2003, did not reduce plaintiff's litigation risk, unless one first posits that the second report must necessarily be the correct one. Third, while it may be that the "sloppy" lab work here was that of CT & E, not Teck or Columbia, CT & E was the contractor chosen by Teck to analyze samples for reporting purposes, and so it is not unfair to require Teck to bear the consequences of CT & E's presumed error.[37] Finally, it may be noted that there is a sampling error issue inherent even in the "corrected" DMR, because it recited lab results from CT & E which would show a violation unless they are discredited as erroneous. Teck's motion for summary judgment on the June 13, 2000 cadmium violation lacks merit. Application of the rationale in *Sierra Club* to the facts shows that Adams is entitled as a matter of law to a determination that there was a cadmium violation on June 13, 2000.

## C. Adams' Cross–Motion For Liability On All Cadmium Claims

To succeed on the cross-motion, Adams must establish that the undisputed facts show either that the violations actually did continue after the complaint was filed, or that any reasonable trier of fact would reject the proposition that there is no real likelihood that the violations would be repeated. Adams takes both approaches.

With respect to the contention that there were violations after the complaint was filed, Adams contends, that while there were no violations of the cadmium limits *per se*, violations of other permit limits, specifically the total dissolved solids ("TDS") limit and the cyanide limit, are sufficient to support a claim of ongoing violation. Adams asserts that this "more holistic" approach was adopted by the Ninth Circuit in *Natural Resources Defense Council v. Southwest Marine, Inc.*[38]

Before assessing the accuracy of Adams' characterization of *Southwest Marine*, it is helpful to set out the alternative theories of ongoing violation identified in *Natural Resources Defense Council v. Texaco*.[39] There, the court identified three theories: The "permit based" theory holds that if any permit parameter-viz. any permit limit-is being violated, that violation supports jurisdiction over claims based on entirely past violations of other permit parameters (limits). The "by-parameter" theory requires a current violation of the specific permit parameter which is the subject of a particular claim. The "modified by-parameter" theory expands on the "by-parameter" theory by allowing a plaintiff to proceed "by proving a likelihood that the same inadequately corrected source of trouble will cause recurring violations of one or more different parameters."[40] The

---

could then put on proof of sampling error remains.

**37.** Indeed, Teck even expected CT & E to have trouble at first. To avoid problems, Teck should not have engaged CT & E until CT & E could establish its competence which it might have done by re-analyzing sample first analyzed by Columbia while it remained the official outside lab.

**38.** 236 F.3d 985 (9th Cir.2000).

**39.** 2 F.3d 493, 498–499 (3rd Cir.1993).

**40.** *Id.* at 499.

Third Circuit has held that the "modified by-parameter" approach is the most consistent with the Clean Water Act,[41] and this court agrees. Of course, if the Ninth Circuit actually did adopt a different theory in *Southwest Marine*, this court would apply the Ninth Circuit's standard.

Examination of the Ninth Circuit's decision in *Southwest Marine* discloses that, without using the term, the Ninth Circuit did apply the "modified by-parameter" approach. In *Southwest Marine*, the defendant contended that the plaintiff had not shown any evidence of an on-going violation of a permit parameter when all it pointed to were continuing housekeeping failures in the implementation of its storm water pollution prevention plans. Upholding the district court's evidentiary determinations, the Ninth Circuit wrote: "Because the district court found that Defendant's failure to implement its storm water plans led to discharges that violated those standards, the court's conclusion that Defendant violated its storm water permit was not error."[42] In other words, just as in *Texaco*, the appellate court held that a finding that the same inadequately addressed source of trouble was causing on-going violations of a permit parameter was a continuing violation of the relevant parameter. Accordingly, this court will apply the "modified by-parameter approach" named and applied in *Texaco*, and applied without being named in *Southwest Marine*.

■ In the case at bar, the cause of the violation of the cadmium standards was the result of Teck's failure to ensure that a sufficient quantity of sodium sulfide was added to the waste water to precipitate out the cadmium prior to discharge of the effluent. There is no evidence that an inadequate quantity of sodium sulfide played any role in the violation of the TDS and cyanide limits. Adams' argument that there were ongoing violations fails under the "modified by-parameter" standard.

Adams' alternative argument is that summary judgment is proper because the fact finder could not conclude that there is "no real likelihood of repetition." Adams points to the alleged 40 most recent violations, numerous cadmium violations in the 1990s, violations of other permit parameters, the alleged cadmium violation at the port site in September of 2004, and the opinion testimony of Dr. Moran.

■ The 40 violations occurred several years ago. Teck offers evidence to show that there have been no violations of the Mine Permit since July 31, 2005, by which time Teck had introduced and mastered the operation of a new process for reducing cadmium discharges. In light of that evidence, the 40 violations in the past are not persuasive evidence of what may happen in the future. Similarly, the cadmium violations from the 1990s are without any probative value regarding the likelihood of future violations. Under the "modified by parameter" approach, violations of other permit limits are not probative with respect to violation of the cadmium limits.

The alleged recent violations at the Port Site are not persuasive. As noted above, the Mine Permit and the Port Permit set different cadmium limits, and most significantly, as a result Teck uses different processes to comply with the different limits at the two sites. It follows that a violation of the Port Permit cadmium limits would have no bearing on the likelihood of a violation of the Mine Permit cadmium limits.

Finally, this court does not find Dr. Moran's opinion very persuasive.[43] Essen-

---

41. *Id.*

42. 236 F.3d at 989.

43. Dr. Moran's opinions are found in his declaration which is attached as an unnumbered exhibit to Adams' motion papers at docket 52.

tially he opines that in human endeavors, and especially technical work, errors are always possible and inevitably some will occur. Were that the criterion, any violation of any permit would be ongoing, a proposition incompatible with the case law which clearly contemplates that some past violations are not ongoing. Dr. Moran notes that there have been errors in the past at Teck's facilities, and so he concludes, there will be more in the future. What is missing is any explanation of how specific errors in the past would repeat in the present context.

In sum, Adams' evidence falls well short of that required to establish as a matter of law that Teck's violation of the cadmium limits in the Mine Permit are ongoing. Adams is not entitled to summary judgment on the alternative argument.

## V. CONCLUSION

For the reasons set out above, Teck's motion for summary judgment at docket 41 is **DENIED**, and Adams' cross-motion for summary judgment at docket 52 is **GRANTED** to the extent that the court does find that there was a violation of the cadmium limit for the Mine Permit on June 13, 2005, but in all other respects the motion at docket 52 is **DENIED**.