Enoch **ADAMS, Jr.,** Leroy Adams, Andrew Koenig, Jerry Norton, David Swan, and Joseph Swan, Plaintiffs,

v.

**TECK COMINCO ALASKA, INC., Defendant.**

**Nana Regional Corporation and Northwest Arctic Borough, Intervenors–Defendants.**

**No. A04–49 CV (JWS).**

United States District Court, D. Alaska.

Nov. 4, 2005.

ORDER FROM CHAMBERS

[Re:  Motions at Docket
Nos. 43 and 65]

SEDWICK, District Judge.

## I.  MOTIONS PRESENTED

At docket 43, defendant Teck Cominco Alaska, Inc. ("Teck") moves to exclude plaintiffs' expert testimony regarding the costs of feasibility and pilot studies, and regarding economic benefits obtained by non-parties.  At docket 53, plaintiffs Enoch Adams, Leroy Adams, Andrew Koenig, Jerry Norton, and Joseph Swan oppose the motion.  At docket 65, plaintiffs move to exclude the declaration of Bruce DiLuzio, which is attached to defendant's reply at docket 62.  At docket 74, defendant opposes the motion.  The motions are fully briefed.  No party requested oral argument on either motion, and it would not assist the court.

## II.  BACKGROUND

Except as otherwise noted, the facts in this section are those alleged in plaintiffs' complaint [1] which were not denied in defendant's answer.[2]  Plaintiffs reside in Northwestern Alaska in the village of Kivalina near the mouth of the Wulik River. Kivalina's primary source of drinking water is the Wulik River.  Plaintiffs harvest fish from the Wulik River and its tributaries, and some of them harvest fish and marine mammals from the waters of the Chuckchi Sea not far from the mouth of the Wulik River.  The fish and marine

1.  Doc. 10.     2.  Doc. 6.

mammals are a major food source for plaintiffs.

The Red Dog Mine, which is the world's largest zinc mine, is located on land owned by a Native Alaska regional corporation, the Northwest Arctic Native Association ("NANA"). The mine is situated within the Northwest Arctic Borough about 55 miles from the Chuckchi Sea and is operated by Teck under an agreement with NANA. Ore removed from the open pit mine is milled to obtain zinc and lead concentrates. The concentrates are hauled over the DeLong Mountain Road to storage buildings located about a mile from the coast. In months when the Chuckchi Sea is free of ice, the concentrates are loaded aboard ships for transport to smelters. The storage facilities and other infrastructure at the port site are also on NANA land and operated by Teck pursuant to an agreement with NANA.

Tailings and process wastewater from the milling operation are impounded in a storage area, or tailings pond. Treated wastewater from the tailings pond is discharged into the Middle Fork of Red Dog Creek through Outfall 001. Although mining takes place year round, wastewater is discharged only during the warmer periods, generally from May until early October.

Federal law prohibits discharge of pollutants from point sources except in compliance with the provisions of the Clean Water Act.[3] The discharge of pollutants may be authorized in compliance with National Pollution Discharge Elimination System ("NPDES") permits.[4] In Alaska, such permits are issued by the federal Environmental Protection Agency ("EPA"). EPA issued NPDES permit number AK–03865–2 for the mine site in 1985, reissued the permit in 1998, modified the permit in July 2003, and administratively extended it when the permit expired on August 28, 2003. The permit authorizes Teck to discharge 2.418 billion gallons of effluent from the tailings pond via Outfall 001 each year. Eleven discharge parameters are found in the permit which uses two limitation types-daily maximum discharge limits and monthly average discharge limits. The permit also sets limits for total dissolved solids ("TDS") in the mine's discharge.

Plaintiffs' complaint alleges ten claims. The first and tenth claims are pertinent to the motions presented herein. The first claim asserts violations of TDS permit limits pursuant to 33 U.S.C. § 1311(a). The claim specifically alleges that the mine site permit for TDS "specifies a daily maximum discharge of 196 mg/l," and that defendant's operations at the Red Dog Mine cause defendant "to discharge TDS through Outfall 001 in quantities approximately 1500 percent higher than its maximum daily limits on every day in which the mine discharges."[5] Plaintiffs further allege that the mine site permit for TDS "specifies a monthly average discharge limit of 170 mg/l per day," and that defendant has violated the permit limits for "monthly average for TDS in every month in which Teck Cominco discharges from Outfall 001."[6]

The tenth claim asserts violations of a consent order issued pursuant to 33 U.S.C.

3. 33 U.S.C. § 1311(a). Section 1 of Pub.L. 95–217 indicates that a set of federal water pollution control statutes—statutes that include those of great relevance to this litigation—may be cited as the "Clean Water Act of 1977." For simplicity and because there have been subsequent amendments, the court uses the term "Clean Water Act" to refer to this statutory scheme.

4. 33 U.S.C. § 1342(a).

5. Complaint at 12, doc. 10.

6. Id. at 14.

§ 1311(a). This "Mine Consent Order," issued by the EPA on July 1, 1999, and modified on May 17, 2002, requires Teck to measure its compliance with TDS discharge limits and to "monitor for certain parameters at the mine site and in streams near the mine site, as well as report certain data and calculations."[7] Plaintiffs allege that Teck "has violated the Mine Consent Order by exceeding the [TDS] discharge limits at Station 7 at least 5 times, by exceeding the [TDS] discharge limits at Station 10 at least 45 times, by failing to monitor as required at least 2 times, and by failing to report as required at least 12 times, for a total of 64 violations of the Mine Consent Order."[8]

Plaintiffs retained Michael Kavanaugh, an economist, to prepare an expert report which "focuses on the economic benefit gained by Teck Cominco by exceeding its TDS limits at its Red Dog mine."[9] Plaintiffs' counsel retained Randolph Fischer, an environmental engineer, to provide expert testimony rebutting the testimony of defendant's expert, Gene Andrews, and to estimate the cost of conducting a feasibility study and site investigation, which includes pilot studies, of TDS treatment options at the Red Dog Mine.

Teck now moves to exclude the expert testimony of Michael Kavanaugh, and the opinion of Randolph Fischer on which Kavanaugh relied, regarding "the projected costs of feasibility and pilot studies[10] examining the treatment of TDS to meet levels established in [Teck's] 1998 NPDES permit for Red Dog Mine."[11] Teck also moves to exclude Kavanaugh's expert testimony as to economic benefits received by non-parties, namely Teck Cominco Limited.

### III. APPLICABLE LEGAL STANDARD

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

■■■ To be admissible, expert testimony must be both relevant and reliable.[12] "Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury."[13] In addition, Rule 702 "charges the court with assuring that expert testimony 'rests on a reliable foundation.'"[14] Rule 702 grants

---

7. *Id.* at 26.

8. *Id.* at 27.

9. Expert Report of Michael Kavanaugh at 1, exh. 3, doc. 43.

10. While defendant refers to the cost estimates for a feasibility study and a pilot study, Fischer states that his estimates are for a feasibility study and a site investigation, which includes pilot studies.

11. Reply at 2, doc. 62.

12. *Daubert v. Merrell Dow Phars., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

13. *Elsayed Mukhtar v. Cal. State University, Hayward,* 299 F.3d 1053, 1063 n. 7 (9th Cir. 2002) (quoting *United States v. Rahm,* 993 F.2d 1405, 1413 (9th Cir.1993)).

14. *U.S. v. Hermanek,* 289 F.3d 1076, 1093 (9th Cir.2002) (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786).

the district court discretionary authority "to determine reliability in light of the particular facts and circumstances of the particular case." [15]

## IV. DISCUSSION

### A. Motion at docket 43

Under the Clean Water Act, if a district court finds a violation of an NPDES permit condition or limitation, "then civil penalties under 33 U.S.C. § 1319(d) are mandatory." [16] Section 1319(d) provides in pertinent part, "Any person who violates...any permit condition or limitation...shall be subject to a civil penalty not to exceed $25,000 per day for each violation." "A district court has discretion to set the amount of a penalty (up to the statutory maximum) and is instructed to consider the seriousness of the violation, any economic benefit that resulted from the violation, any history of violations by the party to be penalized, that party's good-faith efforts to comply with the applicable requirements, the economic effect of the penalty on the violator, and 'such other matters as justice may require.' " [17]

Plaintiffs retained Michael Kavanaugh, an economist, to prepare an expert report which "focuses on the economic benefit gained by Teck Cominco by exceeding its TDS limits at its Red Dog mine." [18] In determining the economic benefit, Kavanaugh considered the costs avoided by not conducting studies and investigations to determine what projects were necessary to be in compliance with the NPDES permit.

Kavanaugh's expert report states in pertinent part:

> Plaintiffs' engineering experts inform me that in order for Teck Cominco to comply with the terms of its unmodified permits for TDS at Red Dog it should have performed feasibility and investigative studies to determine the projects that were needed for compliance. In the opinion of the engineering experts the studies and investigations would have identified a suite of projects that could have brought about compliance....*The costs (in 2004$) of the feasibility studies is estimated by the engineering experts at $1 million and the cost of the investigations is estimated by the engineering experts at $5 million.* Since the studies and investigations were never performed their cost is avoided.[19]

It is undisputed that Kavanaugh obtained the $1 million estimate for the feasibility studies and the $5 million estimate for the investigations from Randolph Fischer, an environmental engineer who was retained by plaintiffs' counsel.

Defendant moves the court for an order excluding the testimony of Michael Kavanaugh, and the opinion of Randolph Fischer on whom Kavanaugh relied, "with respect to projected costs of feasibility and pilot studies examining the treatment of TDS to meet levels established in Teck Cominco's 1998 NPDES permit for the Red Dog Mine." [20] Defendant argues that the estimates are without any reliable

---

**15.** *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 158, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**16.** *Natural Resources Defense Council v. Southwest Marine, Inc.,* 236 F.3d 985, 1001 (9th Cir.2000).

**17.** *Id.* at 1001–1002 (citing 33 U.S.C. § 1319(d)).

**18.** Expert Report of Michael Kavanaugh at 1, authenticated copy appears as exh. 1 to doc. 93, original copy is exh. 3 to doc. 43. Hereinafter, the court will cite the authenticated exhibits at docket 93 only.

**19.** *Id.* at 6 (emphasis added).

**20.** Motion at 1–2, doc. 43.

foundation, and do not meet the threshold requirements for the admissibility of scientific and technical evidence. Plaintiff argues that the court should deny defendant's motion on the grounds that "[p]laintiffs' expert Randolph Fischer's extensive experience providing such cost estimates sufficiently establishes the reliability of his opinion and the appropriateness of its use by plaintiffs' expert economist, Dr. Michael Kavanaugh." [21]

The parties do not dispute the qualifications of Fischer or Kavanaugh as experts, nor do the parties contest the relevance of the proffered testimony. Accordingly, the court addresses only the reliability of Fischer and Kavanaugh's expert testimony as to the cost estimates.

Fischer did not include the $1 million feasibility study and $5 million site investigation cost estimates in his expert report. Rather, Fischer provided Kavanaugh with the cost estimates in a phone conversation on December 20, 2004. It is also undisputed that the only other information Kavanaugh received about the cost estimates was an e-mail from Fischer on December 22, 2004, in which Fischer provided a breakdown of the feasibility study costs with a range from $495,000 to $957,000, and a breakdown of the site investigation costs with a range from $3,855,000 to $6,094,000.[22]

In his deposition, Fischer testified that he based his cost estimates on "professional judgment and experience." [23] When asked what sources, if any, he referred to in estimating the cost of the feasibility study, Fischer testified, "None." Fischer's

declaration in opposition to the motion to preclude testimony further states:

Based on my 17 years of mining-related experience as an environmental engineer and my 17 years of experience in performing engineering cost estimates as well as costs estimates for providing professional engineering services, such as site investigations, feasibility studies and pilot-scale treatability testing, the Andrews expert reports provided me with sufficient facts and data to prepare a cost estimate for performing a site investigation and feasibility study, including pilot studies for TDS control technology in this case.[24]

As indicated above, Fischer's $1 million cost estimate for a feasibility study and $5 million estimate for a site investigation are based primarily on his "17 years of mining-related experience as an environmental engineer and [his] 17 years of experience in performing engineering cost estimates." [25] While "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience," the advisory committee notes emphasize that "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." [26]

Here, Fischer fails to explain how his experience leads to the cost estimates at issue, and how his experience is reliably applied to the facts of this case. Moreover, Fischer's deposition testimony reveals that prior to the phone call on De-

21. Opposition at 1, doc. 53.

22. Fischer E–Mail (December 22, 2004), exh. 2, doc. 93.

23. Fischer Deposition at 21, exh. 4, doc. 93.

24. Fischer Declaration, ¶ 42 at 13, attached to doc. 53.

25. *Id.*

26. FED. R. EVID. 702 advisory committee's note.

cember 20, 2004, during which he gave Kavanaugh the cost estimates, Fischer "knew virtually nothing about...what the case was about."[27] In his deposition, Fischer further acknowledges that at the time he had no experience with TDS technology as it existed in 1998, nor any experience designing or implementing the types of water systems that would be necessary to bring Red Dog Mine effluents into compliance with a 197 mg/l standard for TDS.

■ In summary, plaintiffs have not made a sufficient showing that Fischer's cost estimates rest on a reliable foundation. The court excludes the expert testimony of Michael Kavanaugh, and the opinion of Randolph Fischer on which Kavanaugh relied, regarding the estimated costs of feasibility studies and site investigations.

Defendant also asks the court to exclude Kavanaugh's testimony regarding economic benefits allegedly received by Teck Cominco Limited on the grounds of relevance.[28] Kavanaugh's expert report states in pertinent part:

Teck Cominco Alaska Incorporated is the operator of the Red Dog mine. Its ultimate parent is Teck Cominco, a mining company that explores, develops and produces metal and minerals worldwide. Teck Cominco, in my opinion, gained an economic benefit of at least $27.2 to $30.8 million because it failed to comply with the TDS limits in its discharge permit when it discharged water from Red Dog to waters of the United States.[29]

.    .    .    .    .

The limits of Teck Cominco's discharge permits for Red Dog were modified as of August 28, 2003. The pollution control projects needed to meet the limits after August 28 2003 are not the same as those that were needed between June 1, 1999 and August 28, 2003. As a result, Teck Cominco avoided entirely the spending for studies, investigations, and projects that were needed for compliance with the unmodified permit, had the use of the funds not spent for pollution control, and gained an economic benefit from its noncompliance.[30]

In his deposition, Kavanaugh testifies that he looked at "Teck Cominco Alaska's parent's balance sheet" rather than Teck's financial statements in determining economic benefit, particularly the equity cost of capital.[31] Kavanaugh further testifies that "the parent was the better entity to use to value the funds because...the funds made available by avoiding and delaying compliance with the TDS weren't simply at the disposal of [Teck] but were available to the parent."[32] In calculating the economic benefit that resulted from Teck's alleged violation, Kavanaugh essentially calculated what Teck Cominco Limited could have earned on funds made available "by not spending the money for a feasibility study, a pilot plant and a suite of projects."[33] Kavanaugh assumed that "[h]ad Teck Cominco Alaska, Incorporated complied

---

**27.** Fischer Deposition at 27, exh. 4, doc. 93.

**28.** The parties do not dispute Kavanaugh's qualifications as an expert, nor do the parties contest the reliability of the proffered testimony. Accordingly, the court only addresses the relevance of Kavanaugh's expert testimony as to the economic benefits obtained by Teck Cominco Limited.

**29.** Expert Report of Kavanaugh at 1, exh. 1, doc. 93.

**30.** *Id.* at 2.

**31.** Kavanaugh Deposition at 104, exh. 4, doc. 93.

**32.** *Id.* at 107.

**33.** *Id.* at 113.

with the permit, it might have had to go to Teck Cominco [Limited] to get funding." [34]

Defendant argues that Kavanaugh's testimony about the economic benefit obtained by Teck Cominco Limited should be precluded as "simply irrelevant." [35] Citing a Seventh Circuit decision, defendant contends that when considering "the economic benefit (if any) resulting from the violation" under 33 U.S.C. § 1319(d), courts are to consider the evidence of the "economic benefit the violator derived from noncompliance." [36] Defendant further argues,

> To the extent that the plaintiffs are entitled to make a showing of what financial benefits they believed that Teck Cominco Alaska received from allegedly violating its permits, they should be limited to offering evidence of the benefits allegedly received by Teck Cominco Alaska, and not the benefits they may claim were received by other companies that are not parties to this litigation and that are not alleged to have violated any permits.[37]

Plaintiffs argue that, to the contrary, "the financial resources of Teck Cominco Limited, the ultimate parent corporation of Teck Cominco Alaska, are highly relevant to the analysis of the economic benefit received by Teck Cominco Alaska's noncompliance" because "Teck Cominco Limited controls nearly every aspect of Teck Cominco Alaska." [38] Citing *United States v. Municipal Authority of Union Township*,[39] plaintiffs allege that the Third Circuit has "affirmed the relevance of a parent corporation's financial resources in determining the economic benefit of noncompliance in a Clean Water Act enforcement suit, even where the parent corporation is not named as a party." [40]

Contrary to plaintiff's assertion, *Union Township* does not stand for the above proposition. In assessing the benefit to the defendant, the appellate court approved of the trial court's assessment of economic benefit based expressly on the violator's gain from the specific plant where the violation occurred. Economic benefit was not assessed in terms of the impact on the violator's parent company.[41] Rather, in *Union Township*, the court approved consideration of the finances of a parent corporation in analyzing the "economic impact of the penalty on the violator" under 33 U.S.C. § 1319(d).[42] The Third Circuit specifically stated that the reference to the parent corporation's financial statement "merely assured that the penalty would not be set at a level above [the subsidiary's] ability to pay." [43] Here, Kavanaugh used the financial statements of Teck Cominco Limited in calculating the economic benefit resulting from the viola-

34.  *Id.* at 107.

35.  Motion at 7, doc. 43.

36.  *Friends of Milwaukee's Rivers v. Milwaukee*, 382 F.3d 743, 762 (7th Cir.2004).

37.  Reply at 6, doc. 62.

38.  Opposition at 15, doc. 53.

39.  150 F.3d 259 (3rd Cir.1998).

40.  Opposition at 16, doc. 53.

41.  *United States v. Municipal Authority of Union Township*, 150 F.3d 259, 262–63 (3rd Cir. 1998). *See also* the decision by the district court which was affirmed on appeal, *United States v. Municipal Authority of Union Township*, 929 F.Supp. 800, 805 (M.D.Pa.1996). The trial court evaluated the economic benefit based on an estimated $417,000 per annum economic benefit at the specific plant operated by the subsidiary which was the violator.

42.  *Id.,* 150 F.3d at 268.

43.  *Id.* (Subsidiary retained no revenues, so parent's financial resources were highly relevant to ability to pay.)

tion, not in analyzing Teck's ability to pay a penalty.

■ Plaintiffs do not cite, nor has the court's research located, any controlling authority which supports considering a parent corporation's financial statements in determining the economic benefit of a subsidiary's violation of the Clean Water Act where the parent corporation is not named as a party. Furthermore, while plaintiffs misread one Third Circuit case to support Kavanaugh's calculation of the economic benefit allegedly obtained by Teck Cominco Limited, the Third Circuit has specifically ruled that the economic benefit calculation "is intended, at its base, to identify the benefit realized by a violator from delayed expenditures to comply with the CWA." [44] Kavanaugh's expert report also states that "[e]conomic benefit focuses on the violators' economic gain from noncompliance." [45] In this matter, it is undisputed that the violator is Teck, not Teck Cominco Limited, and that any penalty imposed in this matter would be imposed on Teck, not Teck Cominco Limited. As this court reads the case law, the economic benefits allegedly received by non-parties, here Teck Cominco Limited, are not relevant at this juncture.[46]

## B. Motion at docket 65

Plaintiffs move to exclude the declaration of Bruce DiLuzio, which was attached to defendant's reply to the motion to preclude expert testimony regarding economic benefits obtained by non-parties.[47] In his declaration, DiLuzio, who is the Secretary of Teck, testifies that Mr. Robertson, Mr. Henningson, and Mr. Horswill are or were officers and directors of Teck Cominco Alaska, Inc. DiLuzio further testifies that when Robertson, Henningson, and Horswill "perform work for [Teck]...they do so in their capacity as officers and/or directors of [Teck] and not in their capacity as employees of any other companies with which they may be affiliated." [48]

Plaintiffs move to exclude DiLuzio's testimony under Federal Rules of Civil Procedure 26 and 37 on the grounds that defendant did not previously identify DiLuzio as a witness. Defendant opposes the motion on the grounds that the disclosure of DiLuzio's as a witness is not required under Rule 26, in part because DiLuzio's testimony "merely served to impeach the testimony offered by the plaintiffs that [Robertson, Henningson, and Horswill] acted in their capacities as employees of other corporations and not in any capacity with Teck Cominco Alaska." [49] Rule 26(a)(1)(A) requires the disclosure of the name of "each individual likely to have discoverable information that the disclosing party may use to support its claims or defenses, unless solely for impeachment."

■ Because the testimony contained in DiLuzio's declaration was used solely to impeach testimony offered by plaintiffs, the court denies plaintiffs' motion to exclude the declaration of Bruce DiLuzio. Moreover, the court notes that it did not rely on the testimony contained in DiLuzio's declaration in ruling on defendant's motion to preclude testimony regarding economic benefits obtained by non-parties.

44. *U.S. v. Allegheny Ludlum Corp.,* 366 F.3d 164, 178 (3rd. Cir.2004).

45. *Id.* at 4.

46. The court is not here taking a position on the propriety of considering the financial circumstances of the parent company in assess-

ing any penalty that may later be imposed on Teck.

47. Doc. 65.

48. DiLuzio Declaration at 2, exh. 7, doc. 62.

49. Doc. 74 at 3–4

### V. *CONCLUSION*

For the reasons set out above, defendant's motion at docket 43 to preclude expert testimony is **GRANTED**, and plaintiffs' motion at docket 65 to exclude the testimony of Bruce DiLuzio is **DENIED**.