CENTER FOR BIOLOGICAL
DIVERSITY, et al.,
Plaintiffs,

v.

MARINA POINT DEVELOPMENT
ASSOCIATES, et al.,
Defendants.

No. CV04–7036–R.

United States District Court,
C.D. California.

June 12, 2006.

Bernice Conn & Michael A. Geibelson, Robins, Kaplan, Miller & Ciresi L.L.P., Los Angeles, CA, Kassia R. Siegel, Center For Biological Diversity, Joshua Tree, Adam F. Keats, Center For Biological Diversity, San Francisco, CA, for Plaintiffs.

Robert D. Crockett & Robert K. Lu, Latham & Watkins, Los Angeles, CA, Janice M. Schneider, Latham & Watkins, Washington, DC, for Defendants.

## OPINION AND ORDER FOLLOWING COURT TRIAL

REAL, District Judge.

### I. Introduction

The Center for Biological Diversity ["the Center"] and the Friends of Fawnskin ["the FOF"] [together, "the Plaintiffs"] commenced this suit to enjoin the development of a residential condominium project

on the shoreline of Big Bear Lake, California ["the Project"]. The Center is a nonprofit public interest conservation organization that works to protect native species and their habitats through science, policy, and environmental law. The FOF is a coalition of local residents of and visitors to Fawnskin that aims to preserve the town's character, environment, and wildlife. The Defendants are the real estate partnership and principals responsible for developing the Project.

The Plaintiffs sued under the Clean Water Act ["CWA"] §§ 301 and 404, 33 U.S.C. §§ 1311 & 1344, and the Endangered Species Act ["ESA"] § 9, 16 U.S.C. § 1538. At an extensive court trial, they produced overwhelming evidence of the Defendants' repeated breach of and disregard for their obligations under the law. After considering all the evidence, this Court grants the Plaintiffs a permanent injunction against further development of the Project. The Court also awards them statutory damages in the amount of $1,312,500.00.

## II. Procedural History

This case was transferred to this Court in February 2005, after early proceedings before Judge Timlin. At the time of the transfer, the Plaintiffs had obtained temporary and preliminary injunctive relief on the ground that a violation of the ESA was likely to occur in the future.

After the transfer, this Court denied the Defendants' motion to dismiss for lack of subject matter jurisdiction and, later, its motion for summary judgment. The motion to dismiss was based primarily on the requirement, under both statutes, to serve a notice of intent to sue at least 60 days before filing suit. *See* ESA, 16 U.S.C. § 1540(g)(2)(A)(i); CWA, 33 U.S.C. § 1365(b). The Court denied the motion because it found that the Plaintiffs had sent intent-to-sue letters to the Defendants' managing agent at the Project site—Irving Okovita—and that those letters were sufficient notice of their intent to sue. The Court subsequently denied the Defendants' motion for summary judgment because it found that there existed genuine issues of fact for trial.

At trial, the Court received the direct testimony of the parties' witnesses through trial declarations and presided over cross-examination between August 23, 2005 and August 30, 2005. On December 12, 2005, it heard the parties' closing arguments and then took the matter under submission.

## III. Factual Background

The Project site lies on the north shore of Big Bear Lake and the east shore of Grout Bay. It is a key foraging and perching habitat for the bald eagle, a threatened species protected by the ESA, 16 U.S.C. § 1531 *et seq.* The eagles like to perch on the 200–year–old Jeffrey pine trees on and around the Project site. Prior to any development, aerial photographs compiled by the U.S. Forest Service revealed a montane marsh and wet meadow alongside Grout Creek, a tributary west of the Project site. For the most part, these historic wetlands are rife with plant and animal life.

During the 1980s, the Defendants began to plan for the development of the site and went about securing the necessary permits. They obtained initial approval from the County of San Bernardino ["the County"] in 1983 and final approval in 2001. In the interim, they applied to the Army Corps of Engineers ["ACOE"] for a permit under § 404 of the CWA [a "404 permit"]. Following public comment on and several redesigns of the Project, the ACOE issued them a 404 permit on September 10, 1991. The permit forbade the Defendants from (1) placing rip-rap below the then-present contours of the lake bottom; (2) depositing sand below the high water line; (3) trans-

ferring fill or structures to the neighboring wetlands; and (4) working at all from December 1 to April 1 of any year, out of deference to the seasonal habits of the bald eagle population. As a final condition of the permit, the Defendants had to obtain a waiver or a certification from the relevant state agency in order to satisfy § 401 of the CWA. That state agency—the California Regional Water Quality Control Board ["RWQCB"]—issued its order for water discharge requirements ["WDR"] in February 2002. The 404 permit itself was extended in 1994 and then again in 1997 and 2000, with a final expiration date set for September 10, 2002.

As part of this process, the Defendants secured two other necessary permits. To work in state waters, they obtained a permit from the California Department of Fish and Game ["CDFG"]. Two conditions of this permit were that they (1) install silt curtains; and (2) locate their siltation basins away from the lake. The permit was issued in June of 1992 and its expiration date was extended over time to November 30, 2003. Finally, in September 2001, the Big Bear Municipal Water District ["BBMWD"] issued them a permit to dredge the lake, provided that they employ mitigation measures including silt curtains, slope protection, and a public footpath to the lake. Notably, the Defendants never obtained a permit under CWA § 402 [a "402 permit"].

Construction began in May 2002, and by the end of August of that year the Defendants had graded nearly the entire site by bulldozer. They then applied for an extension to their 404 permit, in view of its September expiration date. The evidence, however, is that their contractor returned without a permit on October 7, 2002 to grade the site and weed-whack the willows on the adjacent wetlands. In any event, on March 3, 2003, the ACOE denied the Defendants' request for an extension, cit-ing the need further to evaluate the impact of the Project on the bald eagle population (all the more so because twelve years had passed since it had issued the original 404 permit). Although the ACOE did not reinstate the expired permit, it did promise to review and process their next permit application expeditiously. No new application was submitted, however, until June of 2004.

Instead, on May 1, 2003, the Defendants deployed dredging equipment on the site and began dredging on the west bed of the lake. They did so without using silt curtains and by using a dragline dredge that, unlike a clamshell dredge, creates more than incidental fallback of material into the water and thus could not be used without a 404 permit. Throughout early May, moreover, their contractors continued bulldozing the Project site. On May 16, the County suspended the grading permit (and did not reinstate it until March 30, 2004) but the dredging continued into June. During this time, the Defendants deposited buckets of fill material below the lake's ordinary high water mark ["OHWM"]. By the end of the month, they had discharged significant amounts of fill below the OHWM and, on shore, they had accumulated piles of rock beneath the neighboring pine trees. On June 30, 2003, the ACOE sent them a letter explaining that their dragline dredging violated applicable regulations and required a 404 permit.

Meanwhile, a July 1, 2003 email by one of the Defendants' principals acknowledged that the County inspector's photos showed that there was no silt curtain in place. By July 8, contractors had hastily installed one but it was not long enough, and it tore quickly. Photographs taken after its installation show that silt easily escaped from the sides and underbelly and even through holes in the curtain itself. Nonetheless the dredging continued into

July. To facilitate their activities, the Defendants removed rip-rap from the marina jetty, which exposed the soil to erosion from waves, wind, and precipitation and, as a result, sediment streamed directly into the lake. Indeed, July turned out to be a busy month. By July 15, 2003, the Defendants had (1) removed a concrete boat landing that had existed on the east side of the site, and then graded the area; and (2) bulldozed a streambed that was also on the east side, removing willows and other vegetation in the process. Because both the landing and streambed helped demarcate the high water mark, their removal obscured whether the Defendants had been working below that mark (ahead of an ACOE inspection on July 16). All the while, the dredging continued.

Finally alerted to this activity, the ACOE issued a cease-and-desist order on July 23, 2003. Two weeks later it met with the Defendants and advised them that no further work would be permitted until it issued either a new permit or an interim remedial action order. The Defendants subsequently requested interim approval to resume work. In response, the ACOE issued an Initial Corrective Measure Order ["ICMO"] on October 16, 2003 that required the Defendants to complete detailed remedial action by December 1, 2003, ahead of the arrival of the bald eagles. In particular, the ICMO mandated (1) rock stabilization on the jetties; (2) the plugging of the marina entrance; and (3) the installation of geotextile materials on the remainder of the project's shoreline. The order expressly stated that it authorized only the remedial actions prescribed and that any further development of the site would require a new permit.

The ICMO required a showing of compliance by December 15, 2003. The Defendants, however, failed to comply in two ways. First, they immediately resumed their dragline dredging. Second, they vio-lated the December 1 deadline. The work they performed left the shoreline vulnerable to erosion from wind and precipitation, and the straw they placed on the site provided insufficient protection. As a result, by the middle of 2004 the lake bed had experienced substantial erosion, and by the time the major rains began in December 2004, the erosion and discharge of dirt and rocks into the lake had gotten much worse. On November 24, 2004, the RWQCB issued a notice of violation finding (1) inadequate erosion and sediment control; (2) improperly functioning silt curtains and straw cover; and (3) unstable soil piles.

By January 2005, extreme weather conditions made emergency repairs necessary to prevent the Project from eroding into the lake. Accordingly, the ACOE issued an emergency permit to repair the damage that had occurred since the "cessation" of work in December 2003. Specifically, the permit called on the Defendants to repair the erosion damage; repair the silt curtain; shape the slope; manage the quarry waste; construct a berm to direct sediment flow; and limit dredging to 10,500 cubic yards.

The Defendants ignored these requirements. Instead they resumed dredging below the OHWM and without a silt curtain in place, and the curtain they finally did install was several feet from the shore and in a constant state of disrepair. They did next to nothing to prevent further erosion or ameliorate the damage they had already caused but continued to direct their energies toward the Project. As a result, by March 2005, portions of the banks on the west side of the Project had eroded into the lake and the bulldozed road below the OHWM had become submerged by the rising water. The historic wetlands of Big Bear Lake were left sitting in several feet of dredged soil.

This damage, which remains today, has affected the bald eagle population. In the winter of 1999–2000 and the years preceding it, Kim Brickley regularly observed bald eagles on the site and its trees as well as in and around Grout Bay. Likewise, from November 2003 to March 2004, Karin Powell spotted bald eagles on the site nearly everyday in the early mornings. So did Sandy Steers, who began taking photographs and keeping notes of her sightings that winter. By the following winter, however, the number of eagles was rapidly dwindling.

## IV. The Endangered Species Act

Congress enacted the ESA in an attempt to preserve endangered species and the ecosystems upon which they depend. 16 U.S.C. § 1531(b). The Supreme Court has reviewed the language and legislative history of the Act and concluded without reservation that "Congress intended endangered species to be afforded the highest of priorities." *Tenn. Valley Authority v. Hill*, 437 U.S. 153, 174, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).

Bald eagles in particular have been protected by the ESA for decades. *See* 43 Fed.Reg. 6233 (Feb. 14, 1978) (listing the bald eagle as an endangered or threatened species in every state); 60 Fed.Reg. 36,000 (July 12, 1995) (reclassifying bald eagles in the lower 48 states from endangered to threatened). As a threatened species, the eagles are entitled to all the protections of the statute. 60 Fed.Reg. 36,000 (July 12, 1995). One of the primary threats to their continued survival is the destruction or degradation of their habitats. *Id.* at 36,-006. Habitat destruction occurs through (1) the direct cutting of trees for shoreline development; (2) human disturbance associated with the recreational use of shorelines and waterways; and (3) the contamination of those waterways as a result of pollution. *Id.*

■ Section 9 of the ESA prohibits a "take" of a listed species without a permit issued by the U.S. Fish and Wildlife Service. 16 U.S.C. § 1538(a); 50 C.F.R. § 17.31(a). In accordance with the purposes of the statute and its legislative history, the term "take" is read as broadly as possible. *Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 704–05, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995) (pointing out that the government could regulate or even prohibit the activities of birdwatchers if the effect of their activities was to make it more difficult for birds to hatch or raise their young). Under the statute, to "take" means (1) to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture; or (2) to collect or to attempt to engage in any such conduct. 16 U.S.C. § 1532(19). The term "harm" means significant habitat modification or degradation that actually kills or injures wildlife by significantly impairing its essential behavioral patterns, including breeding, feeding, or sheltering. 50 C.F.R. § 17.3. The term "harass" is defined as any act or omission that creates a likelihood of injury to wildlife by annoying it to the point of disrupting its normal behavioral patterns, which again include breeding, feeding, and sheltering. *Id.*

■ To obtain injunctive relief, a plaintiff need only show that the defendants' activities are likely to cause a take in the future. *Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir.1994); *Marbled Murrelet v. Pac. Lumber Co.*, 83 F.3d 1060, 1067–68 (9th Cir.1996). This standard recognizes that the balance of hardships and the public interest tip sharply in favor of endangered species. *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982).

■ In this case, construction on the Project site so far has already caused a

"take" by harassing the bald eagle population by modifying and disturbing its habitat. By all accounts, the bald eagle population there, as well as around the lake more generally, is declining. The large 200–year–old Jeffrey pine trees on which the eagles perch are being eliminated at a rate that is much faster than nature can replenish, and further work on the Project will only accelerate that process. The Defendants' dredging and grading activities not only impact the eagles' shallow water habitat—which works to evict their primary prey—but they deepen the lakefront as well—which makes it more difficult for them to see the prey that remain. In short, the Project has significantly degraded the bald eagles' habitat.

Furthermore, the continued construction of the Project and the activities associated with it will impact, impair, and disrupt essential bald eagle behaviors going forward. Plainly, the occupation of more than 130 condominium units, along with their numerous recreational amenities (including an ice skating pond; a marina office; a health club and pro shop; hiking, jogging, and nature trails; and concessions along the lakeshore) will cause significant additional disturbance to the eagle population. The impact will include the disruption of their foraging and feeding behaviors as well as diminished nesting success. Ultimately, it will render their habitat inhospitable.

## V.  The Clean Water Act

Congress adopted the CWA to maintain and restore the physical and biological integrity of the nation's waters. 33 U.S.C. § 1251(a). The statute makes it unlawful to discharge pollutants into federal waters. § 1311(a). The term "pollutant" is defined broadly as "dredged spoil, . . . biological materials, . . . rock, sand, [and] cellar dirt." § 1362(6). The definition of the term "discharge" is similarly broad: "any addition of any pollutant to navigable waters from any point source." § 1362(12). A "point source" is "any discernible, confined and discrete conveyance," including "any pipe, ditch, channel, tunnel, conduit, well, discrete fissure." *Id.*

Protected waters of the United States include intrastate lakes such as Big Bear Lake. *See* 33 C.F.R. § 328.3(a)(3). They also encompass adjacent wetlands, even if the lake and wetlands are separated by natural river berms, man-made dikes or barriers, beach dunes, and the like. 33 C.F.R. § 328.3(a)(7). Although wetlands are commonly associated with swamps and marshes, they are more precisely defined as areas inundated by surface or ground water at a frequency and duration sufficient to support a prevalence of vegetation typically adapted for life in saturated soil conditions. 33 C.F.R. § 328.3(b).

At Big Bear Lake, BBMWD resolutions establish the OHWM at 6,743.2 feet in elevation. The adjacent wetlands extend from that mark to the edge of the pine forest. The Act plainly protects the lake and wetlands—a conclusion impliedly reached by the ACOE when it exercised jurisdiction over them.[1]

### A.  Private Right of Action for CWA Violations

The text of the CWA creates an express right of action for any citizen to file suit on

---

[1]. The scope of the ACOE's jurisdiction for non-tidal waters, such as Big Bear Lake, depends upon the presence of adjacent wetlands. If no wetlands exist, jurisdiction extends only to the OHWM. If they do, jurisdiction extends to their outer reaches. 33 C.F.R. § 328.4(c). The ACOE's administrative activity in this case did not and does not limit the Plaintiffs' right of action; only action by the EPA or the state of California would have that effect. *See* 33 U.S.C. § 1365(b)(1)(B); *Washington Public Interest Research Group v. Pendleton Woolen Mills,* 11 F.3d 883, 885–87 (9th Cir.1993).

her own behalf against any person who is alleged to be in violation of (1) an effluent standard or limitation; or (2) an administrative order issued with respect to the standard or limitation. 33 U.S.C. § 1365(a).

■ The "in violation of" language authorizes suits for ongoing violations. *Sierra Club v. Union Oil Co.*, 853 F.2d 667, 671 (9th Cir.1988). Although no private action lies for wholly past violations, evidence of past violations can help prove a continuing violation as well as establish the likelihood of future violations. *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found.*, 484 U.S. 49, 58–59, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). A continuing violation also may be demonstrated through acts that occurred after the filing of the complaint or through acts from which a reasonable trier of fact could find a continuing likelihood of intermittent or sporadic violations. *Natural Res. Def. Council v. Sw. Marine, Inc.*, 236 F.3d 985, 998 (9th Cir.2000). Ongoing but sporadic violations do not cease to be considered ongoing until there is no real likelihood of repetition. *Id.* In this vein, a court may evaluate the defendant's remedial efforts to determine if a continuing violation has indeed ceased. *Sierra Club*, 853 F.2d at 671.

Although the issue of Plaintiffs' standing has been litigated, it was raised again at trial. Defendants repeatedly assert that only an agency can sue to enforce compliance with a permit that it has issued. The Defendants, however, largely operated without any permit at all. Their 404 permit expired on September 10, 2002, and they never bothered to obtain a 402 permit. Their activities fall squarely within the purview of § 1365.

## B. Section 402

■ Section 402 of the CWA provides a permit regime for stormwater discharg-es. 33 U.S.C. § 1342. But the Defendants were never issued a 402 permit and only applied for one in January 2005, after this suit had commenced. Nor may they seek cover under the ACOE's cease-and-desist order, ICMO, or emergency permit because those orders and permits were remedial in nature and did not amount to or function as 402 permits. They did not authorize further development of the Project but rather instructed the Defendants to undertake limited corrective measures to prevent further violations.

■ Without the appropriate permit, the Defendants' point source discharges violated the CWA. Point sources include not only the sources that generate pollutants but also the conveyances—such as gullies and ditches—that transfer them to protected waters. 33 U.S.C. § 1362(14); *S. Fla. Mgmt. Dist. v. Miccosukee Tribe*, 541 U.S. 95, 105, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004). Debris and construction equipment qualify as well. *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1009 (11th Cir.2004). In this case, the Defendants' inadequate system for managing erosion helped create gullies that deepened over time despite subsequent efforts at mitigation. Additionally, the Defendants left behind piles of dredged sand and gravel that the storm water carried into protected waters. *See Sierra Club v. Abston Constr. Co.*, 620 F.2d 41, 45 (5th Cir.1980). These erosion-generated discharges violate the CWA. *See id.* 44–45.

## C. Section 404

■ Section 404 authorizes a permit regime for discharges of dredge and fill material. 33 U.S.C. § 1344. Discharges of dredged and fill material into the lake or subject wetlands violate the CWA. *See Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810, 814–15 (9th Cir. 2001), *aff'd*, 537 U.S. 99, 123 S.Ct. 599, 154

L.Ed.2d 508 (2002). Activities that require a permit include grading, dredging, earthmoving, and bulldozing. *Id.* Violations are deemed "continuing" when the violator (1) illegally dumps fill material in wetlands or other federal waters; and (2) is in a position to remove the pollutants but fails to do so. *See, e.g., Sasser v. Administrator, U.S. E.P.A.,* 990 F.2d 127, 129 (4th Cir.1993); *Informed Citizens United, Inc. v. USX Corp.,* 36 F.Supp.2d 375, 377 (S.D.Tex.1999) (holding the "in violation" requirement satisfied by the continued presence of fill in wetlands); *U.S. v. Reaves,* 923 F.Supp. 1530, 1534 (M.D.Fla. 1996) ("Defendant's unpermitted discharge of dredged or fill materials into wetlands on the site is a continuing violation for as long as the fill remains."); *U.S. v. Cumberland Farms,* 647 F.Supp. 1166, 1183–84 (D.Mass.1986), *aff'd* 826 F.2d 1151 (1st Cir. 1987) (holding that the defendant violated the CWA not only for each day that it used a bulldozer or backhoe in the wetlands but for each day that it allowed the illegal fill material to remain there).

Here, the Defendants' activities since September 2002 have violated the CWA. First, they did not have an active 404 permit at any time after September 10, 2002. (The ACOE's remedial orders did not function as 404 permits any more than they did 402 permits.) Then, acting without a permit, they deposited fill and dredged soil all over the wetlands. They did this in part by using a dragline dredge that created more than incidental fallback into the lake. The ACOE advised them that a clamshell dredge would comply with the CWA even absent a permit, but the Defendants chose to stay the course. Finally, they used silt curtains that were too small, improperly placed, and torn. The damage to the land and the rich vegetation and marine species that it nurtures will repair very slowly, if at all.

The fact that the Defendants persist in the belief that their dredging did not require a 404 permit shows that, but for this Court's injunction, theirs would be a continuous, ongoing violation. Besides, their past violations—and their apparent contempt for the ACOE's regulation of their activities—suggest a strong likelihood of future violations. *See Sierra Club,* 853 F.2d at 671. For starters, they ignored their 404 permit's clear prohibition against the deposit of fill in the wetlands when they bulldozed the site. They then went ahead with the bulldozing despite repeated admonitions that doing so would create fill and thus violate the CWA. After the cease-and-desist order was issued, they waited almost a year to apply for another 404 permit, which they did not and have not received. And finally, their compliance with the ICMO was—to put it politely—perfunctory.

### D. Statutory Penalties under the CWA

Section 309(d) of the CWA mandates civil penalties for defendants who violate the Act. 33 U.S.C. § 1319(d); *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1397 (9th Cir.), *cert. denied,* 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995). Although courts have broad discretion to weigh the evidence and calculate a fair and appropriate penalty, *Tull v. United States,* 481 U.S. 412, 426–27, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987), the statute calls on them to consider the following factors: (1) the seriousness of the violation(s); (2) the economic benefit, if any, derived from the violations; (3) the history of violations; (4) the good faith efforts, if any, to comply with the CWA; (5) the economic impact of the penalty on the defendants; and (6) any other factor that justice requires. 33 U.S.C. § 1319(d).

In practice, courts have taken either a "top-down" or "bottom-up" approach to calculating the statutory penalty. *Compare Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573–74 (5th Cir.1996) (employing a top-down approach) *with United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 528–29 (4th Cir.1999) (taking a bottom-up approach). The bottom-up approach looks first at the economic benefit of the violation, which is often difficult to ascertain. *Pub. Interest Research Group v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 80 (3d Cir.1990). The top-down approach, on the other hand, first calculates the maximum penalty possible and then reduces that penalty in consideration of the statutory factors. *Cedar Point*, 73 F.3d at 573.

Because this Court finds that the top-down approach offers a more reliable and less speculative method of calculating the penalty, the first step is to determine the maximum possible penalty. The maximum daily penalty for violations committed between January 20, 1997 and March 15, 2004 was $27,500; for acts committed after the latter date, it is $32,500. *See* 40 C.F.R. § 19.4. In this case, Defendants have been in violation since at least October 7, 2002, when they resumed grading the Project site. From that date until the date of the preliminary injunction, the maximum penalty is $15,445,000.

The second step is to consider the six factors of § 309(d). First, there is no doubt that the Defendants' violations were serious. Although they did not totally decimate the wetlands, they have diminished the quantity and quality of habitat for wildlife such as the bald eagle and reduced the ability of the wetlands to perform hydrologic functions such as sediment filtration and runoff flow. Second, the Defendants have not explained in adequate detail the economic benefit that was or is to be derived from their violations.

Although a residential development often brings economic benefit to an area, the Defendants have not quantified the benefits that their Project (and, specifically, their violations) will bring to the local community, a task made more difficult by the fact that the Project is still in its infancy. Third, the history of the Defendants' repeated violations is supported by substantial evidence, including the testimony of ACOE personnel.

Fourth, the Defendants have continually exhibited a lack of good faith in complying (or failing to comply) with the CWA. The record before the Court is clear. They have continued to fill the wetlands both above and below the OHWM despite the cease-and-desist order, and they blew off the corrective measures ordered by the ICMO and emergency permit. Although they testified that they did not believe they needed 402 and 404 permits, that testimony is belied by the fact that the ACOE specifically instructed them otherwise. The only good faith they have shown thus far is in complying with this Court's injunction, under penalty of contempt. Finally, even the fifth factor does not necessarily counsel a downward departure from the statutory maximum because the Defendants have made no showing that the penalty would impose an undue financial burden on them.

On balance, the Defendants' history of violations and lack of good faith militate in favor of a strict penalty while the specter of financial hardship counsels against a heavy-handed approach. The Court finds that the Defendants are in continuing violation of both § 9 of the ESA and § 301 of the CWA and that there is a significant likelihood of future violations.

Therefore, IT IS ORDERED that the Defendants pay a statutory penalty of $2,500 for each day of violation, totaling

$1,312,500.00 from October 7, 2002 to April 16, 2004.

In addition, IT IS FURTHER ORDERED that the Defendants be enjoined from any development on the Project site without the prior authorization of this Court.

Finally, IT IS ORDERED that the Defendants immediately take all remedial measures prescribed by the ACOE to repair and restore the integrity of the shoreline and the wetlands.

The Court retains jurisdiction over this matter to ensure the Defendants' full compliance with the terms of this order and the dictates of the ACOE.