UNITED STATES OF AMERICA, Plaintiff,

v.

**TORLAW REALTY, INC., et al., Defendants.**

**No. EDCV03–0755SGLOPX.**

United States District Court, C.D. California.

March 20, 2007.

Jonathan B. Klinck, Monica L. Miller, Suzette Clover, AUSA–Office of US Attorney, Los Angeles, CA, for Plaintiff.

Martin A. Mueller, Patrick W. Pearce, Piero C. Dallarda, Danielle Gerber Sakai, Best Best and Krieger, Harlan B. Kistler, Harlan B. Kistler Law Offices, Riverside, CA, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LARSON, District Judge.

### I. *INTRODUCTION*

The United States filed its complaint on July 2, 2003, which alleged seven claims

for relief, for: violation of 25 U.S.C. § 415; violation of the BIA's cease and desist order; trespass; ejectment; and three claims for violation of Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6973, RCRA § 7003(a). The United States filed its first motion for summary judgment based on its First Claim for Relief on July 14, 2006, seeking an order finding that Defendants violated 25 U.S.C. § 415 by failing to obtain a lease approved by the U.S. Department of the Interior before commencing operations on the property at issue, and requesting that a permanent injunction be issued ordering Defendants to cease and desist all operations on the property in question and to vacate the property. On August 7, 2006, the Court granted the permanent injunction, ordering Defendants Kim Lawson and Lawson Enterprises "to immediately cease and desist all activities on, and to immediately vacate the land in question. Defendants are ordered to refrain from operating any business on the land unless and until they obtain a lease that has been approved by the Secretary of the Interior."

The United States filed its second motion, seeking summary adjudication on its Third, Fourth and Seventh Claims for Relief on October 13, 2006. On November 30, 2006, the Court granted the United States' second motion, ruling that the United States had established: the first three elements of its Third Claim (trespass); the first two elements of its Fourth Claim (ejectment); and that Defendants violated the unilateral administrative order issued pursuant to RCRA § 7003(a) pursuant to the Seventh Claim. The Court specifically determined that the only issues remaining for trial were:

(1) The extent to which the United States was harmed and whether and to what extent Defendants' entry onto the site caused the harm (Third Claim for trespass);

(2) Whether and to what extent the United States was damaged by Defendants' wrongful conduct (Fourth Claim for ejectment); and

(3) The appropriate amount of penalties to be assessed, as well as issues regarding clean up of the site (Seventh Claim for RCRA violations).

(Order Granting Plaintiff's Motion for Summary Adjudication (hereafter "Order") dated November 30, 2006 at 13–14.) The United States agreed to dismiss the other causes of action. (Pretrial Conference Order, lodged December 5, 2006 (hereafter "PTC") at 4.)

■ On December 19 and 20, 2006, a trial was conducted on the above-referenced issues before the Court. The United States was represented by Assistant United States Attorneys Leon W. Weidman, Jonathan B. Klinck, and Monica L. Miller and by Special Assistant United States Attorney Letitia D. Moore. Defendant Kim Lawson represented himself. Defendant Lawson Enterprises, a California general partnership, was not represented.[1] Default had previously been entered against Defendant Torlaw Realty, Inc., a suspended Nevada corporation, on January 7, 2004.

## II. FINDINGS OF FACTS

The following facts were admitted by the parties or previously found by the Court:

---

**1.** A partnership can not be represented in court by a non-lawyer. *In re America West Airlines,* 40 F.3d 1058, 1059 (9th Cir.1994). Best Best & Krieger, which represented both Defendants Kim Lawson and Lawson Enterprises, was relieved as counsel for both Defendants before trial.

1. The United States owns title to that portion of the Torres Martinez Desert Cahuilla Indian Reservation identified as TM 314, which is legally described as SW 1/4 NW 1/4, Section 24, Township 7 South, Range 8 East, San Bernardino Meridian, Riverside County, California ("Site"), which it holds in trust for: Robert Morreo; Michael Morreo; Daniel Morreo; David Morreo; Michelle Meraz; Hèlena Morreo; Lila Morreo and Allen Morreo (the "Allottees"). (PTC at 4.)

2. Defendants Kim Lawson and Lawson Enterprises contend Lawson Enterprises is a partnership. (PTC at 4.)

3. The Lawson Defendants contend Kim Lawson is a partner in Lawson Enterprises. (PTC at 5.)

4. Kim Lawson is an officer of Torlaw Realty, Inc. (PTC at 5.)

5. Kim Lawson and the late Virgil Richard Lawson, Jr. contend they entered into a Partnership Agreement with some of the Allottees whereby the partners intended to operate a "waste separation and recycling business." (PTC at 5.)

6. At no time did the Defendants have a lease approved by the United States Secretary of the Interior to operate their business at the Site. (PTC at 5.)

7. Defendants commenced business at the Site in 1992. (PTC at 5.)

8. On September 16, 1999, EPA issued a Notice of Open Burning Violation to Defendants directing that open burning at the Site stop immediately. The open burning did not stop. (PTC at 5.)

9. Defendants operated a solid waste business on the property from 1992 until the Court's August 7, 2006, Order requiring Defendants to vacate the property. (PTC at 5.)

10. Defendants' operations included receipt, handling, and disposal of green waste, construction and demolition debris. (PTC at 5.)

11. Defendants periodically openly burned waste between approximately 1992 and May 2003. (PTC at 5.)

12. From 1992 until August 7, 2006, Defendants received money from individuals and businesses who delivered solid waste to the Site. (PTC at 5.)

13. During the period from 1992 through August 7, 2006, the green waste stored or disposed of at the Site included grass clippings, plants, tree limbs, palm fronds, palm trees, and landscaping debris. (PTC at 5–6.)

14. On May 2, 2003, EPA issued to Torlaw Realty, Inc.; Kim Lawson and Virgil Lawson, Jr. dba Lawson Enterprises; Virgil Richard Lawson, Jr. dba Lawson Ranch & Enterprises; and Scott Lawson, a Unilateral Administrative Order ("UAO"). (PTC at 6.)

15. On May 5, 2003, the United States Postal Service delivered the UAO to Defendants at the Site. (PTC at 6.)

16. The effective date of the UAO was May 16, 2003. (PTC at 6.)

17. The UAO required that Defendants cease all open burning of solid waste upon the effective date of the UAO. (PTC at 6.)

18. The UAO required that Defendants install a fence around the property within 20 days of the effective date of the UAO, or by June 5, 2003. (PTC at 6.)

19. Installation of the fence required by the UAO was not completed until after August 29, 2003. (PTC at 6.)

20. The UAO required that Defendants post specified signs around the property within 20 days of the effective date of the UAO or by June 5, 2003.

21. Installation of the signs required by the UAO was not completed until after August 29, 2003. (PTC at 6.)

22. The UAO required the Lawson Defendants to notify in writing all employees,

owners and agents that open burning of solid waste at the Site was prohibited by the UAO. (PTC at 6.)

23. The UAO required the Lawson Defendants to submit a copy of the notification to the employees to EPA. (PTC at 6.)

24. Pursuant to the UAO, the deadline for the notices to the employees with the confirmation to EPA was May 17, 2003. (PTC at 6.)

25. Kim Lawson notified his employees orally that open burning was prohibited after the deadlines imposed by the UAO. (PTC at 7; Order at 5 & 12.)

26. The UAO required that Defendants prepare, seek approval of, and implement a mitigation plan within 30 days of the effective date of the UAO. (Order at 4 & 12.)

27. Defendants never prepared a mitigation plan, and therefore never obtained approval of and never implemented such a plan. (Order at 12.)

28. Defendants' retention of a waste management specialist, creation of a waste management plan or a fire suppression plan, and other actions taken to address the concerns raised by EPA cannot substitute for their failure to comply with the UAO's specific provisions regarding a mitigation plan. (Order at 12.)

29. From mid–2005 through 2006, Defendants made additional investments in fire prevention with the addition of a well, pumps, water and work truck and various items of equipment leased or purchased based upon the advice of the Riverside County Fire Department. (PTC at 7.)

30. The 2003 Cease and Desist Order required Defendants to stop transporting, and/or allowing the transportation and delivery by others, waste material to the Site; to cease the disposal business immediately; and to remove all waste, debris and materials from the Site and restore the land to its original state prior to establishing the disposal business. Defendants failed to do so. (PTC at 7.)

31. The United States, acting through the Bureau of Indian Affairs ("BIA"), took possession of the Site on August 9, 2006. (PTC at 7.)

The following facts were proven at trial:

1. Prior to the Defendants' activities on the Site, the land was vacant and flat, with some native plants and grasses. (Transcript of Trial Proceedings for December 19, 2007 (hereafter "TR") 24, lines 22–23; TR 14–15, lines 25–1; Exs. 136–1 and 136–2.)

2. From 1992 until August 7, 2006, the Defendants received money from individuals and businesses who delivered solid waste to the Site, including checks made payable to defendant Torlaw Realty, Inc. (TR 99–100, lines 7–24.)

3. Defendants paid the Allottees twenty-five percent of the gross receipts. The Allottees' share of the gross receipts amounted to approximately $10,000 to $15,000 per month, and sometimes $20,000 per month. Defendant Kim Lawson's share was the remaining seventy-five percent of the gross receipts, from which he paid the overhead, which was very low. (TR 105, lines 11–24.)

4. In addition to green waste and construction and demolition debris, the Defendants stored plastics, waste barrels, compressed gas cylinders, automobiles, vehicle parts, computers, computer screens, polyvinyl chloride materials, insulation and household garbage at the Site. (TR 121, lines 1–15; TR 23, lines 1–11; Ex. 9; see also Order at 3.)

5. Haulers brought chromated copper arsenate-treated ("CCA") grape stakes to the Site, and CCA lumber and grape stakes were burned in the fires at the Site. (TR 57, lines 16–20; TR 7–11, lines; TR

121, lines 48; TR 121–122, lines 23–9; TR 129, lines 6–11.)

6. The Site now contains mounds of waste that are approximately 30 to 50 feet higher than they were in the early 1990s. (TR 67, lines 4–12; Ex. 131.)

7. From 1992 to the present, the solid waste stored or disposed of at the Site included ash created from wastes burned at the Site. (TR 23, lines 12–13.)

8. EPA sent a notice to Defendants in 1993 advising them that open burning was prohibited by federal law and that violators could be subject to penalties. (Ex. 7.)

9. Open burning causes significant adverse environmental and health problems. (Exhibits 72; Tr 54, lines 14–20; TR 115, lines 9–22; TR 117, lines 11–16, TR 118–119, lines 5–11.)

10. The Site contains soil contaminated with dioxin, which is toxic and a known carcinogen. (Ex. 72, pp. 6–8; Ex. 9, p. 15; Ex. 70, p. 2.)

11. CCA products contain arsenic, which is a known carcinogen, and poses a health hazard to residents in the neighboring trailer park. (TR 58, lines 7–9; TR 57–59, lines 23–1.)

12. Open burning causes uncontrolled emissions of air pollutants and increases the amount of dioxin in the environment. (Ex. 72, pp. 5–6; Ex. 70, p. 4.)

13. The Site is located in a region that is already adversely affected by air pollution. (Ex. 72, p. 6.)

14. The Riverside County Fire Department drafted a fire suppression plan for the Site and made specific recommendations to Kim Lawson to reduce the likelihood of fires, but Mr. Lawson never fully implemented the plan. (TR 131–132, lines 7–6; TR 133–134, lines 1–5.)

15. The BIA, the South Coast Air Quality Management District, representatives of the U.S. Congress, and local school districts received complaints about the smoke and fires. (TR 24, lines 2–13; TR 64, lines 3–20; TR 95, lines 8–25; TR 109–110, lines 1–9.)

16. Some of the Allottees complained about Defendants' operation. (Exhibits 15 & 18.)

17. The Torres Martinez Desert Cahuilla tribal council requested the BIA take action to address Defendants' actions on the Site. (Ex. 54.)

18. Riverside County has been required to devote financial resources, water resources and fire response resources to the Site, thus affecting the surrounding communities. (TR 116–120, lines 14–5.)

19. Between January 1, 2002 and April 30, 2005, the Riverside County Fire Department responded to 25 fires at the Site. (TR 124, lines 21–25; Exhibit 87, pages 52 and 53.)

20. The Riverside County Fire Department responded to at least 20 fires in 2006. (TR 125, lines 13–18.)

21. Some fires at the Site burned for several days and one fire in April 2005 burned for approximately two weeks. (TR 68, lines 16–18; TR 125, lines 19–24.)

22. Nine members of the Riverside County Fire Department have been injured since August 2006 fighting fires at the Site. (TR 115, lines 18–24.)

23. Four elementary schools with a total of 3100 students, a middle school with 900 students, and a high school with 1600 students, are located within a four mile radius of the Site. (TR 95, lines 6–15.)

24. Smoke from open burning activities in the area has forced teachers to restrict the school children from playing on the school yard and has caused increased reports of headaches and stomachaches among the school children. (TR 95–96, lines 20–6.)

25. Smoke from fires at the Site has been observed in communities as far as 30 miles away and has resulted in false calls for fire response in those communities. (TR 118, lines 19–25.)

26. The United States has been harmed and damaged by Defendants' conduct. (TR 23–24, lines 20–7; TR 24–25, lines 20–10; TR 33–34, lines 25–5; TR 36–37 lines 22–3.)

27. Among its damages, the BIA is required to reimburse the County of Riverside for costs associated with responding to the fires. (TR 32, lines 3–20; Ex. 134.)

28. As of December 19, 2006, the fire response costs were close to $1.8 million. (TR 33, lines 14–16; TR 117, lines 23–25.)

29. The Site currently has no useful function because of the quantity of debris on it and the risk of fire. (TR 25, lines 7–10.)

30. Defendants left approximately 1,029,900 cubic yards of waste at the Site. (TR 45, line 8; Ex. 132.)

31. The amount and type of wastes, along with their configuration, contribute to the possibility that a fire could erupt spontaneously, requiring the need for further fire response efforts. (TR 115, lines 2–4.)

32. Defendant Kim Lawson stated he cannot afford to hire a contractor to clean up the Site. (TR 106, lines 11–24.)

33. The United States will be required to retain the services of companies to characterize the wastes on the Site and then remove and transport those wastes to an appropriate facility. (TR 33, lines 25–7; TR 36–37 lines 22–3; TR 44, lines 6–18; TR 45, lines 13–18.)

34. The United States has obtained three estimates to determine how much it would cost to remove the waste from the Site. (TR 45, lines 19–23; Ex. 128; Ex. 129.)

35. The three estimates are as follows: (1) $9 million, assuming the Site contains no hazardous materials; (2) $41 million, assuming the Site contains hazardous and non-hazardous materials; and (3) a second estimate of $112 million, also assuming the Site contains hazardous and non-hazardous materials. (TR 45–46, lines 22–3.)

### III. CONCLUSIONS OF LAW

1. Federal law controls an action for trespass on Indian land. *United States v. Pend Oreille Public Utility Dist. No. 1,* 28 F.3d 1544, 1550 n. 8, (9th Cir. 1994), *cert. denied,* 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995). Remedies for trespass on Indian land under federal common law include: ejectment and damages, *Marsh v. Brooks,* 49 U.S. (8 How.) 223, 232, 12 L.Ed. 1056 (1850); accounting, *United States v. Santa Fe Pacific R.R,* 314 U.S. 339, 359, 62 S.Ct. 248, 257–58, 86 L.Ed. 260 (1941); and damages, *County of Oneida v. Oneida Indian Nation,* 470 U.S. 226, 233–34, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985); *see also United States v. Southern Pacific Transp., Co.,* 543 F.2d 676, 684 (9th Cir.1976). The United States can recover damages and obtain a permanent injunction to remove "the encroachment" in an action for trespass. *United States v. Imperial Irrigation Dist.,* 799 F.Supp. 1052, 1068–70 (S.D.Cal.1992)(assessing damages and weighing injunctive relief for trespass on Indian land).

2. Removing the encroachment in this case involves removing the waste from the Site. Other terms or concepts related to removing the waste are "cleaning up" the Site and/or "abating" the hazards at the Site. The United States has used the terms interchangeably in these proceedings because the concepts cross over within the various claims.

3. The United States is entitled to monetary damages to compensate it for all

damages, including future damages, based on trespass. *Marsh*, 49 U.S. at 232, 49 U.S. 223; *Imperial Irrigation Dist.*, 799 F.Supp. at 1069.

4. The United States is entitled to damages in the form of restitution and abatement costs under the Fourth Claim for ejectment. *Marsh*, 49 U.S. at 232, 8 How. 223; *Imperial Irrigation Dist.*, 799 F.Supp. at 1069.

5. The Court may order any equitable relief it determines appropriate, including response and cleanup costs, to address the harm which Defendants caused to Plaintiff.

6. Equity demands that Defendants abate the Site to remove the threat posed by the Site and reimburse the United States for the actual costs (past and future) incurred in responding to the risks created by Defendants' operations on the Site. *Cf. Meghrig, et al. v. KFC Western, Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996) ("RCRA's primary purpose, rather, is to reduce the generation of hazardous waste and to endure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment'" and determining a private citizen could seek a mandatory injunction to force the responsible party to properly dispose of the waste.)

7. Section 7003 of RCRA "focuses on the abatement of conditions threatening health and the environment...." *U.S. v. Northeastern Pharm. & Chem. Co.*, 810 F.2d 726, 740 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *see* 42 U.S.C. § 6973(b).

■ 8. "The primary relief available to a private party under RCRA is a mandatory injunction i.e., one that orders a responsible party to 'take action' by attending to the cleanup or proper disposal of toxic waste...." *Gilroy Canning Co. v. California Canners and Growers*, 15 F.Supp.2d 943, 945 (N.D.Cal.1998).

■ 9. Post-filing cleanup costs are not barred by RCRA. *Id.*

10. The Court may fine Defendants up to $5,500 for each day through March 15, 2004 on which Defendants failed to comply with EPA's RCRA § 7003 administrative order. 42 U.S.C. § 6973; 40 C.F.R. Part 19.

11. The Court may fine Defendants up to $6,500 for each day after March 15, 2004 on which Defendants failed to comply with EPA's RCRA § 7003 administrative order. 42 U.S.C. § 6973; 40 C.F.R. Part 19.

■ 12. An appropriate starting point for calculation of penalties is the statutory maximum. *Cf. Center for Biological Diversity v. Marina Point Development Associates*, 434 F.Supp.2d 789, 799 (C.D.Ca. 2006)(Clean Water Act penalty). RCRA § 7003 itself does not provide factors to consider in assessing penalties for violations of or failure to comply with an administrative order.

13. Factors courts have considered in assessing penalties for violations, where the statute does not provide penalty factors, include: good or bad faith of defendants; injury to the public; defendant's ability to pay; necessity of vindicating the authority of the responsible agency; and desire to eliminate the benefit derived from the violations. *See F.E.C. v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir.1989).

14. Pursuant to *United States v. JG–24, Inc.*, 331 F.Supp.2d 14, 70 (D.P.R.2004), a central purpose of penalties is deterrence and the deterrent value of a substantial civil penalty includes deterrence on others to whom the law also applies. *See United States v. Bethlehem Steel Corp.*, 829 F.Supp. 1047, 1057 (N.D.Ind.1993), *aff'd in part, vacated in part on other grounds*, 38 F.3d 862 (7th Cir.1995); *United States v.*

*Environmental Waste Control, Inc.,* 710 F.Supp. 1172, 1242 (N.D.Ind.1989).

15. Defendants' failure to comply with the RCRA § 7003 administrative order warrants daily penalties.

16. Defendants' total disregard of warnings and orders from EPA and BIA, as well as Defendants' total disregard of federal and tribal laws, demands assessment of a substantial penalty.

17. RCRA prohibits open dumping and open burning of solid waste. 42 U.S.C. § 6945; *see* 40 C.F.R. § 257.3–7(a) & 258.24(b).

## IV. CONCLUSION

■ With respect to the United State's claim of trespass, the Court finds the United States has demonstrated it suffered actual harm and Defendants' entry onto the Site caused substantial harm to the United States.

With respect to the United States's claim of ejectment, the Court finds the United States was harmed by Defendants' unlawful detention of the Site.

■ With respect to the claims that Defendants violated RCRA, the Court finds Defendants' failure to comply with the UAO warrants an assessment of civil penalties. Specifically, the Court finds Defendants were in violation of the UAO on 1,181 days from May 17, 2003, to August 9, 2006. Defendants are ordered to pay a penalty in the amount of $2,362,000.00 ($2,000.00 per day).

The United States is entitled to monetary damages for the violations of RCRA and for the trespass and ejectment actions. These damages are comprised of all past and future damages including all response, abatement and clean up costs related to the Site, including $1.8 million in fire response costs. Defendants are ordered to pay all response, abatement and clean up costs related to the Site as they accrue, not to exceed $42,800,000.00.

Because it is not clear that Defendants have the ability to pay for the costs of cleaning up the Site at this time, the Court orders that the United States may pay, at its discretion, for the costs of response, abatement and clean up, and that Defendants shall be jointly and severally liable for all such response, abatement and clean up costs, subject to the limits set forth in the preceding paragraph. All funds collected from Defendants shall first be applied to satisfy the costs of response, abatement and clean up. After such response, abatement and clean up costs have been satisfied, any remaining funds shall be applied to payment of the penalty assessed.

IT IS SO ORDERED.